PETER TURNER *v.* STATE.

'(*Knoxville.*   September Term, 1907.)

1.   **MURDER IN THE FIRST DEGREE.**  Evidence sufficient to sustain a conviction.

Evidence stated and held sufficient to sustain a conviction of murder in the first degree.

2.   **SAME.**  Killing at request of deceased is.

One who kills another at his request or command is guilty of murder in the first degree.   (*Post, p.* 671.)

3.   **SAME.**  Express malice toward deceased is not necessary.

Express malice, in the sense of hatred or malevolence toward the deceased, need not be shown in order to support a verdict of murder in the first degree.   (*Post, pp.* 671-675.)

Cases cited and approved:   Dale v. State, 10 Yerg., 551; Swan v. State, 4 Humph., 136; Bratton v. State, 10 Humph., 108; Lewis v. State, 3 Head, 148; Warren v. State, 4 Cold., 130.

4.   **SAME.**  No reversal for insanity not shown otherwise than by the enormity of the offense, when.

In a prosecution for murder in the first degree, committed pursuant to an agreement that the defendant was to kill the deceased and then himself, where there was evidence showing that the defendant was a man of intelligence and some education, and no evidence of hereditary insanity, or previous acts tending to show an unbalanced mind, a verdict of guilty will not be disturbed by the supreme court on the ground that defendant was insane when he committed the act.   (*Post, pp.* 675-676.)

FROM KNOX.

Appeal in error from the Criminal Court of Knox County.—D. D. ANDERSON, Judge.

FRANK SANDERS and J. ARTHUR ATCHLEY, for Turner.

ATTORNEY-GENERAL CATES for State.

MR. JUSTICE MCALISTER delivered the opinion of the Court.

The prisoner was convicted of the crime of murder in the first degree for the unlawful killing of one Minnie Scott, and was sentenced to hang. The killing occurred in East Knoxville, at the corner of Lithgow street and Church avenue, about 7 o'clock in the evening of March 15, 1907. The deceased was the wife of one W. B. Scott. The plaintiff in error was unmarried. The parties are all negroes. At the time and place stated persons living in that vicinity were attracted by the discharge of a pistol three or four times in rapid succession. An examination revealed the dead body of the woman, Minnie Scott, with three pistol wounds on her person— one in the mouth, one in her breast, and the third wound in her abdomen. Shortly after the discovery of the

dead body of the woman, the prisoner, Peter Turner, appeared at his boarding house somewhere in that vicinity and stated to Charles Cheatham, colored, that he had killed Minnie Scott. He stated that he and Minnie Scott had been lovers, and for several months past had agreed to die together; that he was to kill Minnie, and then kill himself. He said he had met her that night at the corner of Lithgow street and Church avenue, when he shot her. He stated that he first shot her through the mouth, and that she said, "Shoot me again, here" (holding her hand to her abdomen), whereupon he shot her again, when she said, "Shoot me again, here" (placing her hand on her breast), when he shot her a third time, and she sank down on the ground. Defendant further stated that he knew people would be attracted by the shooting and find him there, and so he ran away, coming to his room from the place of the shooting.

To another witness, Pat Campbell, witness stated that he had shot Minnie Scott; that they had been sweethearts for a long time, and several months ago agreed that they would die together. He stated that after he killed Minnie he was about to break and reload his pistol for the purpose of shooting himself; that his heart failed him, and he could not shoot himself, and, seeing a white woman coming down the street, he ran away. Defendant also stated to this witness that at the time of the killing he was drinking, and would not have shot the woman had he not been overbalanced with whisky.

At a subsequent time the prisoner, in a conversation with Sheriff Reeder, stated that he shot the woman three times and that she fell to the ground, and when he came to shoot himself his heart failed him and he could not do it.   On another occasion he stated to Sheriff Reeder that for a long time he and Minnie Scott had had an understanding that they would die together—kill each other—and that on the night in question they had met for the purpose of carrying out that agreement, when he had killed Minnie, shooting her three times, and then undertook to kill himself, but that his pistol snapped, and that is the reason he did not shoot himself.

While in jail the prisoner was searched by the sheriff, who found on his person some match heads broken up and a few dead spiders, all wrapped up together, indicating further preparation to take his life.

It does not appear that there had been any inimical feelings between the prisoner and the deceased, nor is any motive shown for the killing, unless it was in pursuance of a compact entered into between the parties by which they had resolved on mutual self-destruction.   It does appear from the testimony of a negress named Hall that about six months before the killing the deceased and the prisoner were at her house and were left alone in the kitchen.   While in the kitchen a pistol was fired, and the Scott woman was shot in the face.   There was no eyewitness to this shooting, and, while some suspicion attached to the prisoner, he was not charged by the woman with the commission of it, nor was he ever prose-

Turner v. State.

cuted or arrested on that charge. The prisoner, in a written confession of the crime, claimed that the woman fired the shot herself with a pistol that she had on her person, and that he at the time tried to dissuade her from the act and prevent it, but that in struggling for the pistol she succeeded in pulling the trigger, and the pistol was discharged, inflicting the wound in her face.

The record reveals that very soon after the shooting the prisoner went to Middlesboro, where he remained about a week and returned to Knoxville, when he was arrested. When approached by the officer he denied his identity and assumed a fictitious name; but the officer reminded him that he had known him for a long time, whereupon the prisoner admitted that he was Peter Turner. It appears from the testimony of the officer that when he arrested the prisoner he found on his person, among other things, what purported to be a history of the prisoner's relations with the woman, Minnie Scott, together with a complete confession of the killing. This is quite a lengthy document, and is shown to have been written by the prisoner. The substance of this confession is that he had known the deceased for about four years, and that he was accustomed to see her almost daily; that he was very much attached to her, and she to him; that during the four years of their acquaintance there had been no trouble between them. He states that on March 13th, two days prior to the killing, they went together to a certain room for the purpose of carrying into execution their mutual agreement for self-destruc-

tion, but that his nerve failed him. He claims in this: statement that he would not have carried it into execution on the Friday night if he had not been overbalanced with whisky, and in this connection he stated that the woman at the time was also under the influence of whisky. The purport of the letter is that things had come to such a crisis that they could not continue their intimacy without the knowledge of the woman's husband, and that the woman had expressed a preference for death rather than to live without him, and that he had expressed to her the same sentiment. He further states that the woman had repeatedly begged him to kill her, and on one occasion said to him, "Jack, you have lied to me so much, until I hate to make you lie any more," referring to his failure to carry his promise to kill her into execution.

The prisoner then gives this account of the shooting of the woman at the house of the negress Hall about six months before the killing: "When we met there she seemed to still be worried, so I pulled her down on my lap and talked with her a while, and she wanted some beer, so I goes and gets some beer and whisky, and Mrs. Jenkins and her mother hope to drink it, and then they went out on the porch, and Minnie gets up and shuts both kitchen doors, comes back and sat down side me, and we talked on a while, and finally she put one arm around my neck and kissed me three or four times, and said, 'Jack, I have a good mind to blow your brains out and kill myself.' I laughed and said, 'If I was you, I

wouldn't spile my good mind.' I didn't think of her hav-
ing any gun, so she begin to cry, and said, 'Now I mean
that,' and I said, 'I know you do,' and she then taken a
little gun from her bosom, and I grabbed her, and taken
it, and we sat down and talked a while, and she taken
hold of my hand and placed the barrel of that gun in her
left ear and said to me, 'Now pull the trigger,' and I
said, 'Quit your foolishness.' She said, 'I am not fool-
ing.' So she put her finger on mine and tried to press
on the trigger; but I managed to hold her hand and move
the gun from her ear, but in so doing the gun went off,
and thus it was that she got shot.''

The prisoner then relates that he was not charged
with the assault on the woman, and remained about
Knoxville until Christmas, when he went to Etowah,
where he remained until February 3d, when, in response
to a letter from deceased, he returned to Knoxville and
resumed his relations with her, seeing her every day for
about a month. He relates that on the night of the kill-
ing when she was urging him forward to the commis-
sion of the act, he advised her to go home, but she said:
"If I ever go in that home again, I'll be carried in. I
mean to get out of my worry this night, if I have to walk
down to the bridge and jump off in the river." She
then requested him to wait until she could go down to
her cousin's, Laura Campbell's, for a brief visit. I said,
"What for?" she said, "Because I told Will" (her hus-
band) "I was going there, and I want the last words
I told him to be true." She remained at Laura Camp-

bell's about ten minutes and then returned to the corner
of Lithgow and Church streets, where the tragedy was
enacted. The following is the prisoner's statement of it:
"She came back . . . and put her arm around my
neck, and said: 'Now, dear, I am ready to leave this
troublesome world with you, and do it before some one
comes by that knows me. I don't care after I am dead.'
So I placed the gun to her head and fired, and she slap-
ped her hand on her stomach and said, 'Right here,' and
I put the gun there and fired, her arm still around my
neck and mine around her waist; but when I fired that
time she hollowed and said, 'Once more, and I'll be
dead.' So I turned her aloose and put the gun to my
own head, and it failed to go off, and I couldn't go on
with her. But I am going to her just as willing as she
was; for, as she is dead, I don't want to live."

The officer who made the arrest stated that the pris-
oner had in his possession a written statement of Minnie
Scott, the deceased, giving a complete history of her
relations with Peter Turner and their plans to die to-
gether. This statement was given to a detective, Simon
F. Nichols, who it appears was in Chattanooga at the
time of the trial and was not examined as a witness, nor
was the statement of the deceased woman in evidence.

A survey of this testimony leaves no doubt in the
minds of the court that this was a willful, deliberate, and
premeditated killing, and that plaintiff in error is guilty
of murder in the first degree. The fact that the woman
consented and the crime was in execution of a joint

Turner v. State.

agreement would not remove the case from this grade of felonious homicide, since the crime embraced all the elements of malice, deliberation, and premeditation necessary to constitute murder in the first degree.

Murder is no less murder because the homicide is committed at the desire of the victim. He who kills another upon his desire or command is, in the judgment of the law, as much a murderer as if he had done it merely of his own head. 1 Hawk. Pleas of the Crown, ch. 27, section 6; 1 Russell on Crimes, 670, citing Sawyer's Case (1815) Old Bailey MS., all cited in 8 Am. & Eng. Encyc. of Law, p. 294, text, and note 5.

Mr. Wharton, in his work on Homicide (3d Ed.), section 54, states the rule thus: "The law does not require that a homicide shall be committed against the will of the person killed. If a man kills another with his consent, or by his desire, he is as guilty as if he had killed him against his will. . . . And the act of a woman in taking and swallowing poison in the presence and by the direction of a man renders his the act of administering it, constituting it murder in the first degree, where death results."

It may be said, however, there is an absence of express malice, a necessary ingredient of the crime of murder in the first degree, since it is not shown there was hatred, or ill will, or malevolence on the part of the prisoner toward the deceased.

Mr. Wharton, in his work on Homicide (3d Ed.), section 116, says: "The terms 'express malice,' or 'express

malice aforethought,' used in statutory provisions as a
necessary ingredient of murder in the first degree, not
having been defined by statute, have been given the com-
mon-law definition: 'When one with a sedate and delib-
erate mind and formed design doth kill another, which
formed design is evidenced by external circumstances
discovering the inward intention, as lying in wait, an-
tecedent menaces, former grudges, and concerted schemes
to do him some bodily harm.' And a sedate and deliber-
ate mind implies a mental condition sufficiently com-
posed to admit of reflection on the design, and to com-
prehend the nature and probable consequences of the
designed act; and to warrant a verdict of murder in
the first degree under such provisions the killing must
have been the consummation of a previously formed
design to take the life of the deceased, and the design to
kill must have been formed deliberately and with a se-
date mind. An actual and deliberate intention to take
the life of another, or to do him some great bodily harm
from which death might probably result, constitutes ex-
press malice. The statutory term means express malice
aforethought as it existed at common law, as distin-
guished from implied malice. It necessarily renders
any murder of the first degree; and it may be inferred
from the circumstances attending the act of killing, and
is proved by circumstances evidencing a sedate, delib-
erate purpose and formed design to kill another."

The same author, at section 135, says: "And where
a homicide was committed, and there was a deliberate

and premeditated intent to do the act, and no circumstances of excuse, justification, or extenuation recognized by law, it is murder in the first degree."

It thus appears that it is not necessary that express malice, in the sense of hatred or malevolence toward the deceased, should be shown in order to support a verdict of murder in the first degree. This may be illustrated by the case of *Warren* v. *State*, 4 Cold., 130. In that case it appeared that Rainey Warren (a free person of color) was convicted of murder in the second degree for drowning a child under three years old, the son of her former owner. The evidence on the trial tended to show that the crime was actuated by a motive of revenge against the mother of the child. The circuit judge instructed the jury: "The defendant cannot be found guilty of murder in the first degree under the proof. The deceased was a child—a mere infant under three years old —and to make out a crime of murder in the first degree, there must be a premeditated, malicious, and deliberate killing, and the malice must exist in the mind of the person against the deceased. Now, malice in this case is absent. The prisoner, if she did the killing, had she malice against this little harmless child? If she had malice, was it not against the mother of the deceased or some other person? This, then, was not murder in the first degree."

This charge was erroneous. Said this court: "Malice, it is true, as stated by the court, is an essential element

119 Tenn.—43

in the crime of murder, either at common law or by the statute; but it does not necessarily follow that it must always exist towards the person slain. It may be express or implied. Express malice is where one with a sedate and deliberate mind and formed design kills another, which formed design is evidenced by external circumstances discovering the inward intention, as lying in wait, antecedent menaces, former grudges, and concerted schemes to do him some bodily harm." Wharton's Criminal Law, p. 360.

In the leading case of *Dale v. State,* 10 Yerg., 551, Judge Green, in defining the constituent elements of murder in the first degree, said: "When the act of killing is not done in the commission or attempt to commit some felony, nor by poison or lying in wait, in order that it be murder in the first degree, the killing must be done willfully (that is, of purpose, with intent that the act by which the life of a party is taken should have that effect), deliberately (that is, with cool purpose), maliciously (that is, with malice aforethought), and with premeditation (that is, a design must be formed to kill before the act by which the death is produced is performed). In other words, proof must be adduced to satisfy the mind that the death of the party slain was the ultimate result which the concurring will, deliberation, and premeditation of the party accused sought."

In *Swan v. State,* 4 Humph., 136, Reece, J., said: "The characteristic quality of murder in the first degree, and that which distinguishes it from murder in the second

degree or any other homicide, is the existence of a set-
tled purpose and fixed design on the part of the assailant
that the act of assault should result in the death of the
party assailed; that death being the end aimed at, the
object sought for and wished."

"Proof must be adduced to satisfy the mind that the
death of the party slain was the ultimate result which
the concurring will, .deliberation, and premeditation of
the party accused sought." *Bratton* v. *State,* 10 Humph.,
108; citing *Commonwealth* v. *Jones,* 1 Leigh (Va.), 611.

In *Lewis* v. *State,* 3 Head, 148, it is said: "The dis-
tinctive characteristic of murder in the first degree is
premeditation. This element is superadded by the stat-
ute to the common-law definition of murder. Premedi-
tation involves a previously formed design or actual in-
tention to kill. But such design or intention may be
conceived and deliberately formed in an instant."

When these principles of law are applied to the facts
of this case, every element to constitute murder in the
first degree distinctly appears, and the verdict of the
jury is fully  justified.

Counsel representing prisoner at the bar argued that
the prisoner was insane at the time he committed the
act, and incapable of distinguishing between right and
wrong. This argument is based largely upon what is·
supposed to be intrinsic evidence of mental unsoundness
furnished by the letters written by the prisoner and read
on the trial below.

The enormity of the act and the absence of any mo-

Turner v. State.

tive for the perpetration of the crime is said to reinforce the intrinsic evidence of insanity furnished by the letters. There was no evidence adduced on the trial of the previous insanity of the prisoner, nor was the testimony of any medical expert taken on this subject. While the motive for the commission of the crime is unusual, yet the criminal records furnished precedents of crimes committed in pursuance of a compact between two infatuated persons to die together. So far from the letters furnishing evidence of the insanity of the prisoner, they disclose evidence of the prisoner's intelligence and that he was a man of some education. As already stated, there was no evidence of hereditary insanity or previous acts tending to show an unbalanced mind, and no jury would have been warranted in pronouncing the prisoner insane, on account of the atrocity of the act and the sentimental motive that inspired it. Moreover, this question was left to the determination of the jury under a correct charge on the subject by the trial judge, and this court finds no evidence in the record to warrant it in disturbing the findings of the jury. It is not disclosed in the record that the prisoner did not have the benefit of the testimony of absent witnesses, nor was any application made for a continuance of the case.

We find no error in the record, and the judgment is affirmed.