## Thomas v. Commonwealth.

(Decided November 21, 1922.)

### Appeal from Jefferson Circuit Court          •

1.  Criminal Law—Continuance—Affidavits.—The court did not abuse its discretion in overruling a motion for a continuance, made alone upon the ground of the absence of a witness, for whom a subpoena was not issued until three days before the trial, and had not been summoned, and the Commonwealth's attorney agreed that the affidavit could be read as the deposition of the witness, and the court admonished the jury, that it must receive the statements of the affidavit, as the testimony of the witness, as if the witness was present in person and made the statements before the jury.

2.  Criminal Law—Argument of Counsel.—If a defendant does not object to an improper argument made by the Commonwealth's attorney, at the time, it is made, he can not be heard to object after verdict.

3.  Criminal Law—Drunkenness or Temporary Insanity as Excuse for Crime.—Voluntary drunkenness or temporary insanity caused by voluntary drunkenness does not excuse crime nor mitigate it.

4.  Criminal Law—Insanity as Excuse for Crime.—To excuse crime upon the ground of insanity, it must appear, that the accused, at the time, the deed was committed was of such unsound mind, that he was unable to discriminate between right and wrong, or if he could do so, that from mental unsoundness he had not will power sufficient to control his actions, and was not able to resist the insane impulse to commit the crime.

5.  Criminal Law—New Trial.—A new trial will not be granted upon the ground of newly discovered evidence, where it is merely cumulative, unless it is material and it is of such a decisive charactr and preponderating effect, that it can be reasonably calculated, that its hearing upon another trial would cause a different result.

6.  Witnesses—Non-Experts—Opinion as to Sanity of Another.—It is competent for a non-expert witness to give an opinion as to the sanity of another, if his opinion is based upon facts of which he has had personal observation, and will depose to such facts before the jury, that it may know, what weight to give to the opinion.

H. M. DENTON for appellant.

CHAS. I. DAWSON, Attorney General, and THOS. B. McGREGOR, Assistant Attorney General, for appellee.

Opinion of the Court by Chief Justice Hurt—
Affirming.

The appellant, Frank Thomas, was indicted for the crime of wilful murder, committed, as was alleged, by shooting and thereby killing Lee J. Arbegust, on the 26th day of November, 1921. He was tried and found guilty by the jury and the penalty for the crime fixed at death. The motion to set aside the verdict and grant a new trial being overruled, a judgment was rendered in conformity to the verdict, and adjudging that he suffer the penalty, as by law provided in such cases. He has appealed. The ground upon which a reversal is urged is that the trial court committed three errors, each of which was prejudicial to his substantial rights, as follows: (1) Overruling a motion for a continuance, (2) misconduct of the Commonwealth's attorney in closing argument to the jury, (3) denying him a new trial upon the ground of newly discovered evidence. These grounds will be considered in their order.

(a) The crime for which Thomas was convicted was committed by him in Jefferson county in a community in which he had resided for many years, and where he was well acquainted with the citizenship and it was well acquainted with him, and at a place near the corporate limits of the city of Louisville, wherein he was tried. The time of the commission of the crime, as was stated, was on November 26, 1921. The indictment was returned by the grand jury on December 7th thereafter, and on the following day the accused was arraigned and a plea of not guilty entered; counsel assigned for his defense; and the indictment set for trial on January 23, 1922. Forty-six days thus intervened from the time of the assignment of the prosecution for trial until the day of the trial. Upon the calling of the action, for trial on January 23rd, and the Commonwealth having announced ready to proceed, the accused moved for a continuance of the cause, which motion was overruled, and this is the denial of a continuance of which complaint is made. The accused, in support of his motion for a continuance, filed an affidavit which set out but one reason for the continuance, and that was the absence of one witness, who, the affidavit stated, resided in Jefferson county, at Valley View. Although there was no intimation in the affidavit that the witness had not been sooner known or that what the witness would testify had

not been sooner learned, a subpoena had not been issued for him until the 19th day of January, requiring his attendance on the 23rd, and the sheriff had returned that he had not been able to find the witness, presumably from the want of time. Although this apparent want of diligence in obtaining the presence of a witness, the court, before overruling a motion for a continuance, required the Commonwealth's attorney to agree that the affidavit might be read as the deposition of the witness, and the affidavit was read to the jury as the deposition of the witness, under the admonition that the jury should accept and consider the statement in the evidence as the testimony of the witness, as though the witness was before it in person, and made such statements under oath. In the light of section 189 of the Code, and the various decisions of this court construing this section, it is impossible to see wherein the court abused its discretion in overruling the motion for a continuance, as well as considering the facts which the witness would testify to, and the further fact that there were more than twenty witnesses from the same vicinity present in court. (b) The misconduct attributed to the Commonwealth's attorney was that in his closing argument to the jury, among other things, said, "It is argued that the family is seeking vengeance, that is as fallacious as the rest of his argument, for if the family were not here listening to the trial, it would have been argued by astute counsel, as I have heard before, that the family is not interested and would rather that the jury bring in a life sentence than a death sentence, and so lawyers are used to that character and class of argument. He addressed himself principally against the death penalty, as to the justice of the death penalty, even where the law and evidence justify it. Such arguments should have been made to the legislature long ago. You have sworn to try this case on the law and evidence, and as to the death penalty you were carefully questioned, each of you, in regard to your views on that subject even as to the age of the defendant as bearing on that question. One of the jurors which had been accepted, you will remember, when someone suggested the age of the defendant stated to the court openly in the presence of the jury, that he wished to be excused on account of the age of the defendant, that he did not believe in the death penalty, where the defendant was an elderly man." To this statement the attorney for the accused objected, stating

that the court had admonished the jury not to consider anything said by a juror upon his examination, and the court then reiterated the admonition by saying to the jury that it should not consider anything that any juror may have said when questioned concerning his qualifications or views. The objection was again made and an exception reserved to the action of the court. If the reference by the Commonwealth's attorney, in the manner in which he did it, to the statement by a juror of his views in regard to the infliction of capital punishment, was erroneous, and it was not cured by the ruling of the court thereon, it was not prejudicial since the juror referred to asked to be excused, because he did not believe in capital punishment, when applicable to an aged man, such as the accused. The accused did not ask that the jury should be discharged because of the prejudicial effect he thought such statement had, and hence, the court did for him all that it was requested to do. The other language made use of by the Commonwealth's attorney, which is complained of, was not objected to by the accused at the time, and after a verdict it is too late to make an objection. With reference to such a matter, if a party sits silent and takes his chances with the jury, and does not call the attention of the court to the improper argument, he should not be allowed to make the objection afterwards. If improper argument is not objected to at the time, it is made, it is considered that the objection is waived in every case. O'Brien v. Commonwealth, 89 Ky. 354. It has, also, been frequently held that if the attention of the court is called to an improper argument, and the jury is admonished in regard to it, a reversal of the judgment will not be had unless it appears that the argument is so prejudicial under the circumstances of the case that the admonition of the court will not cure it. Hilton v. Commonwealth, 13 R. 158; Cotrel v. Commonwealth, 13 R. 305; Clark v. Commonwealth, 111 Ky. 443. Neither will a judgment be reversed on account of an improper argument by the Commonwealth's attorney, if the trial is in other respects conducted fairly and impartially, and no other verdict could have been rendered by the jury, than was rendered. Hourigan v. Commonwealth, 94 Ky. 520; Ray v. Commonwealth, 19 R. 1217. The improper argument, which was not objected to at the time, but is now complained of, was directed by the Commonwealth's attorney to the weight to be given to the testimony of the absent wit-

ness, which was embraced in the affidavit for a continuance, and which was referred to by him substantially as merely an affidavit made by the accused as to what a witness would depose, who was not before the jury, and thereby intimating that if the witness was present he would not make the statement which the affidavit averred would be made by him. If such construction can be justly placed upon the language of the Commonwealth's attorney, it was a highly improper argument, because the motion for a continuance on account of the absence of the witness was overruled upon the agreement of the Commonwealth's attorney that the witness would depose, if present, to the truth of the facts, therein stated, and further, because the court had directed the jury to receive the affidavit as the evidence of the witness as though made by the witness before it, and it is not necessary to say that an argument to a jury contrary to the instruction or admonition of the court to it, is always improper. Although, the argument was not objected to by the accused, the court doubtless realizing the impropriety of the argument, again admonished the jury that it should consider the facts stated in the affidavit, which, it was said the witness would make, as if made by the witness in person before it. This, we think, was sufficient to cure any prejudice created by the argument, even if it had been objected to, and besides the facts of the homicide show it to have been so premeditated and indefensible, and the evidence supporting unsoundness of mind, on the part of the accused, so negligible, that the jury would not have been warranted in making any other verdict, than it did, and hence the argument was in no wise prejudicial.

(c) The contention that the trial court erred to the prejudice of the accused in denying him a new trial, upon the ground that new evidence had been discovered in his behalf after the trial, makes proper and necessary a recitation of facts relating to the homicide and the parties connected with it. The accused resided within less than a mile of Lammer's grocery, and deceased resided within one and one-fourth miles of the same place. Each of them had so resided in that community for a number of years. Louis Demarsh, also, resided in the same neighborhood upon the Hunters Trace road, and about three-quarters of a mile from accused. Demarsh and accused were friends, the former having been a policeman, while the latter was chief of the county police,

and for about two years preceding November 4, 1921, when Demarsh died, he had been in ill health and confined to his home, and during this time the accused visited him often as much as on two or three occasions each week. About the twentieth of September, Demarsh wanted to execute a will and requested his wife to send for Arbegust and to request him to come to his house and write and witness the execution of his will, which she did. For some reason, which the evidence does not develop, the accused had conceived an animosity toward Arbegust, and when the latter in response to the request came to Demarsh's house, accompanied by another neighbor named Crawford, the accused and the mother of Demarsh were sitting in his room, and when Mrs. Demarsh requested them to retire, stating that Arbegust wanted to transact some business with her husband, the accused became angry and said, "Oh! yes, I will let the old boob come in," and when he retired from the room he expressed himself both profanely and angrily about Arbegust and Crawford, and said that "he would get them." His threat caused Mrs. Demarsh to request Arbegust to go out of the house, when he left, by the front way so as to avoid meeting with appellant, who was in the back yard of the house, and Arbegust and the neighbor complied with the request, although they had entered the house from the rear. Either before this occasion or before the probate of the will, which took place shortly after Demarsh's death on December 4th, the evidence does not make clear exactly when, the appellant requested Mrs. Demarsh to permit him to attend to the things necessary to be done in writing or probate of the will, and employ a lawyer of his selection to attend to it, but Mrs. Demarsh declined to permit appellant to do so, expressing herself that she thought Arbegust was better fitted to attend to it than he was. The fact that Mrs. Demarsh would not permit the accused to take charge of the management of the business of the estate, and instead sought the advice and assistance of Arbegust, as well as that of Dr. Shacklett, who was, also, a neighbor, is made to appear as the motive which actuated the accused in his animosity against Arbegust although it appears that he probably bore some ill will to Arbegust previous to that time. After that time he was heard to speak very disparagingly of Dr. Shacklett, who previous thereto had been a warm friend to the accused, and Arbegust, who was a member of the

accused's political party, and a candidate for office at the following November election, was not pleasing to him as a candidate. Seven or eight days after the death of Demarsh, Arbegust was called upon to appear as a witness upon the probate of the will, and Mrs. Demarsh apparently was acting under his advice in the settlement of the estate. About a week before the homicide, the accused met up with and threatened Arbegust in connection with Mrs. Demarsh, and during the following week, he, on one occasion, was endeavoring to meet up with Arbegust, and in speaking of him to a neighbor, called him a "blue-blooded son-of-a-bitch," and said that he, "Arbegust, had got that woman over there," meaning Mrs. Demarsh, and that he and accused "are going to have it before the week is out." On November 26th appellant came to Lammer's grocery early in the morning and while in the store Arbegust came in to use the telephone. Appellant, while Arbegust was using the telephone, went out of the house, and a few steps from the door engaged in a conversation with some parties, who had engaged to haul a load of hay for him, concerning the hauling of the hay. When Arbegust stepped out of the door and was proceeding to the nearby interurban station to take a car for Louisville, accused stepped toward him saying, "Didn't I tell you to leave that woman alone?" and at the same time drawing a pistol, shot him. Arbegust fell upon his side, and accused waiting a few minutes each time to allow the smoke from his pistol to clear away, shot him twice more, causing his instant death. Arbegust was unarmed with the exception of a pocket knife which was closed up and in his pocket, and made no demonstration to do the appellant any harm of any kind. All of the witnesses who were present at the time of the homicide, and saw the accused both before and after its commission, were unanimous in declaring that he was sober and not under the influence of intoxicating spirits, and not laboring under any apparent excitement. Several of these witnesses were old acquaintances and neighbors. The only evidence which tended to show that the accused was under the influence of intoxicants was that of one witness, who deposed that thirty or forty minutes after the homicide he was present when the arrest was made and accompanied him in the machine to the county jail, and that while going to the jail he detected the smell of whiskey from the breath of the accused. Upon the trial

no excuse was offered by the accused for the commission of the crime, nor was any of the foregoing evidence which tended to support the facts above stated contradicted in any way. The evidence offered for the accused was in the attempt to prove that he was intoxicated at the time of the killing and was of unsound mind to such an extent as not to be able to discriminate between right and wrong, or was actuated by an insane impulse. In the endeavor to establish such fact witnesses for the prosecution were cross-examined upon a wide range, and the result of the evidence produced conduced to show that the accused was a high-tempered, turbulent man and of a domineering disposition, and that he would not quietly submit to any opposition to his desires. It was, also, shown by this same evidence that he was addicted to some extent to the use of intoxicating liquors, and had been for many years but not to any excessive degree, and that only occasionally he was observed to be under the influence of intoxicants, and never to such an extent that he was unable to transact any kind of business which he desired to transact. There was an entire absence of any evidence from either the witnesses for the Commonwealth, or the witnesses offered for the accused, except as hereafter stated, tending to prove that he was of unsound mind, or was unable to discriminate right from wrong, or that he had ever been actuated by an insane impulse of any character to commit murder, although the proof developed that he had, previously to the slaying of Arbegust, killed two other men, one of whom was the chief of police of the county. The only evidence tending to show that he was of unsound mind was the affidavit which was read as the deposition of the absent witness, who stated that he had been acquainted with him since boyhood, and that when about fifteen years of age he fell from a swing striking his head upon a stone, and the blow rendered him unconscious for three hours, and that since that time he has never been of a normal mind but has been irresponsible and of unsound mind, and, further, that he had been intoxicated from the use of liquors which produced intoxication for at least six months previous to the homicide. This testimony was contradicted as to the sanity of the accused, by every witness who deposed as to his mental condition and by every circumstance proved in the trial, and the statement as to his continuous intoxication previous to the homicide was contradicted by

every witness upon the trial, who deposed concerning it and by every circumstance of his actions and conduct at the time.

The evidence which the accused relied upon as new and as having been discovered after the verdict and upon which he urges that he should have a new trial, is contained in the affidavits of eight persons, seven of whom have been acquainted with accused, some for a greater and others for a less number of years. The other affidavit is by an expert in the diagnosis of mental diseases. The seven acquaintances state that each will depose that in his or her opinion the accused was of unsound mind, because he had been addicted to the use of intoxicating liquors during many years, and that when under its influence he was sullen, ill natured and threatening, his temper became hasty and he would quarrel with his friends, and would threaten to do violence upon slight provocation, or no apparent provocation, and that he often became involved in personal difficulties when intoxicated, and several add the further reason as the ground of their opinion that he had committed two homicides previous to that of killing Arbegust, and that he slew him without provocation. It is to be noted that these witnesses do not attribute to the accused any act which in their opinions is evidence of insanity, except such acts as were irrational, in their opinion at times when he was under the influence of intoxicating liquors, and there is not a single act or word of the accused which in their opinions was irrational which tended to prove any unsoundness of mind, upon his part except when he was intoxicated. It is, further, evident that many of the supposed facts upon which these newly found witnesses base their opinions are mere hearsay with them, and not facts which came under their observation, and not being experts their opinions so far as they are based upon facts of which they have not personal knowledge, would not be competent evidence upon a trial. To such extent they invade the province of expert witnesses. The opinion of a witness, not an expert, is competent as to the sanity of another when the opinion is formed from facts within the personal knowledge of the witness, and deposed to by him before the jury, that it may know what weight to attach to the opinion. Abbott v. Commonwealth, 107 Ky. 624; Phelps v. Commonwealth, 17 K. L. R. 706; Massie v. Commonwealth, 15 K. L. R. 562; Wright v. Commonwealth, 24 K. L. R. 1838; Buchanan v. Com-

monwealth, 86 Ky. 110; Brown v. Commonwealth, 14 Bush 398. The new witnesses concur in deposing that they will state that they have often seen the accused under the influence of intoxicating liquors, but some of them depose that they have been acquainted with him for as long as forty years, and to see one intoxicated, even many times, during such a period, would not be any evidence that he had from such cause become insane. All authorities are agreed that voluntary drunkenness or a temporary insanity produced by voluntary drunkenness is not an excuse for crime, nor under our system a mitigation of it, for otherwise it would be within the power of every criminal to make himself immune from punishment by becoming drunk when he intends to commit a crime. The existence of drunkenness when a homicide is committed is competent evidence to be heard by the jury to determine whether the act was or was not malicious, but it does not mitigate the crime, except to the extent that it may mitigate the punishment by showing that the crime was committed without malicious intent. Tyra v. Commonwealth, 2 Met. 1; Shannahan v. Commonwealth, 8 Bush 463; Montgomery v. Com'lth, 88 Ky. 509. Neither of these new witnesses was present or pretends to know the condition of mind of the accused when the homicide was committed. If the accused was permanently insane from the use of intoxicants, it would demonstrate itself by his acts and conduct and appearance, as well when sober as when drunk. The expert witness whose affidavit was filed, examined the accused about three months after the homicide, and deposes that in his opinion he was then of unsound mind, from a form of insanity known as senile dementia, and from the effects of which the accused would regard the commission of a heinous crime as justifiable, because of a faulty imagination. He does not however, state, that such was the condition of mind of the accused at the time of the homicide, nor does he state any fact from which it may be inferred that his opinion was that he was unable to discriminate between right and wrong, or that his will power was insufficient to control his actions at the time of the homicide. The Commonwealth in rebuttal of the affidavits filed by accused, filed the affidavits of several witnesses, including the family physician of accused, who deposed that they had known and been associated with him for many years and that they had never observed that he was addicted

to the use of intoxicating liquors, and several of them depose that they never saw him at any time under the influence of such liquors, from which it may be inferred, at least, that his habit of intoxication was not continuous, but was indulged only upon occasions. As before stated, the testimony of all those who were present at the time of the homicide, or saw the accused immediately before or after it, depose that he was not drunk nor under the influence of intoxicants to any appreciable extent. It must be borne in mind that to excuse a homicide on the ground of insanity, the evidence must be such as to establish the fact that the accused was without sufficient reason at the time to know what he was doing, or to know right from wrong, or that as a result of mental disease he did not, at the time of the homicide, have sufficient power of will to control his actions, and was moved by an insane impulse which he could not resist. Graham v. Commonwealth, 16 B. M. 587; Shannahan v. Commonwealth, *supra;* Farris v. Commonwealth, 8 K. L. R. 417; Montgomery v. Commonwealth, *supra;* Scott v. Commonwealth, 4 Met. 227; Babey v. Commonwealth, 169 Ky. 745. The real question in a trial where the defense is insanity is not whether the mind is unsound, but whether it is unsound to the extent of being unable to determine right from wrong, or whether if able so to do, accused was unable to resist the impulse to commit the act. If such was not the test, with the many opinions which may be indulged with regard to the soundness or unsoundness of mind, the punishment of criminals would be rendered almost an impossibility. Usually in a case where there is no other hope of escape from the enormity of a crime, insanity is put forward as a forlorn hope, and many persons indulge the conclusion, that because a crime is committed from a motive, which they may regard as insufficient to justify such an action, the action of the party arises from mental disease. Insanity is not, however, proved by evidence that the slayer entertained no ill will, that was known of by others, or by the enormity of the crime, or by the barbarous manner in which it was committed, or by the fact that there was no apparent provocation. Turner v. State, 119 Tenn. 663; Singleton v. State, 71 Miss. 782. Testimony that one is of a violent, overbearing and quarrelsome disposition, when drunk, can not be said to be evidence of such unsoundness of mind, as will excuse crime. The newly

discovered evidence being merely cumulative of evidence offered upon the trial, as appears from a recitation of the evidence heretofore made and concerning a matter, which was necessarily of common knowledge in the neighborhood a new trial will not be granted, unless the new evidence is of such preponderating and decisive character that it could be reasonably calculated, that if heard upon another trial that the result would be a different verdict from that rendered. It is apparent that the new evidence is not of the character described, and if heard upon another trial would not be reasonably calculated to result in a different verdict, as if all the evidence contained in the affidavits of the newly found witnesses was before the jury, the mental unsoundness of accused, at the time of the homicide, would not be proven. Louisville Ins. Co. v. Hoffman, 70 S. W. 403; L. & N. R. R. Co. v. Wade, 11 K. L. R. 953; Finley v. Tyler, 3 T. B. M. 400; Fleen v. Hollenkamp, 13 B. M. 219; Allen v. Perry, 6 Bush 85; Shely v. Shely, 20 K. L. R. 1021; Monarch v. Cowherd, 114 S. W. 276; Sizemore v. Nants, 149 Ky. 819; S. C. & C. Ry. Co. v. Lee, 153 Ky. 621; Maynard v. Boram, 180 Ky. 392; Home Ins. Co. v. C., N. O. & T. P. Ry. Co., 182 Ky. 778.

The accused seems to have had a fair trial, and his complaint that the community in which the homicide was committed was very antagonistic to him, is not a reason from which it can be inferred that he has been dealt with unjustly. No prejudicial error appearing upon the record, the judgment, although applying the severest punishment known to the law, must be affirmed.