## Cass v. Commonwealth.

(Decided December 9, 1930.)

J. RIVERS WRIGHT, EARL A. E. ECKERLE and DUKE N. E. POWELL for appellant.

J. W. CAMMACK, Attorney General, and HOWARD BLACK for appellee.

OPINION OF THE COURT BY COMMISSIONER STANLEY— Reversing.

For the murder of his paramour, Mary Willie Davis, the appellant, Ben Cass, colored, has been condemned to death. They had lived together for over a year in an alley in Louisville.

The evidence introduced by the commonwealth was in substance that on Sunday a week before the death of the Davis woman, the parties had quarreled over the loss of some money by her and she had left him. On Tuesday he sent her a message to return and clean up the room and help him sell some whisky. She came back on Friday evening, and that night he began beating and abusing her and declared he would kill her. It appears that he had accused the Davis woman of staying with another man during the week of her absence from him. There is no evidence as to further trouble until Sunday afternoon, when, it was testified, the accused renewed his cruelty and kept it up intermittently during the day and night. There are positive statements that defendant struck her across the head with a piece of a broom handle introduced in evidence. About 2 o'clock on Monday morning, Cass and the Divis woman came to a nearby house and, knocking on the door, wanted to know if a man named "Charlie" was there. They aroused Ben Logan, and when he opened the door the woman fell, and Cass cursed and kicked her violently and in this way knocked out some of her teeth. He declared that he would kill her and would make her prove if she had stayed where she had claimed. He snatched her down the steps and took her towards Tenth street. Between 5 and 7 o'clock that morning he was seen in and about the alley by different persons who testified that the defendant knocked her down and beat and kicked her. He also continued his threats to kill her.

After dark on Monday the accused called a neighbor woman in, saying that Mary Willie was drunk and sick.

The woman was found unconscious lying across the bed with bruises on her face and bleeding at the mouth. It appeared that blood had been wiped off her face and the room was in disorder. Cass was drinking, but the neighbor detected no alcoholic odors about the woman. She and Cass went for a doctor, to whom he reported that the woman was drunk and very sick. When the doctor called he found the conditions described. He realized it was a hospital case and made only a superficial examination. He stated that she ought to be taken to the hospital and the alcohol pumped out of her. An ambulance was called and Cass accompanied the woman to the City Hospital, where she died some time during the night.

Dr. Carter, the coroner, testified he had made a careful examination and that her head and body were bruised and lacerated, and that her death was due to a fracture of the top of the skull which had caused internal hemorrhages on both sides of the brain. He expressed the opinion it could have been caused by the stick introduced on the trial. A police officer who had examined the body in the morgue testified that it was badly bruised, especially about the head, and that two of her teeth had been recently removed, but whether they had been knocked out or regularly extracted he could not say.

The defendant denied categorically all the evidence respecting the mistreatment of the woman, and stated that they had never had any serious quarrels and he had never struck her. He said that she had been drinking and had had several spells of a similar nature, and he had found her in a stupor Monday evening and sent for a doctor. He admitted having served a term in the penitentiary.

The evidence of a doctor at the hospital medical ward, to which the woman was sent, was in substance that she was in a deep coma and had the odor of alcohol on her breath; that he made a routine examination of her, and his clinical diagnosis was acute alcoholism, oedema of the lungs and minor abrasions; that she had no "external evidence of a fracture from a clinical standpoint." He stated that "from a clinical standpoint" it was his impression the cause of the woman's death was acute alcoholism and pulmonary oedema. It would seem that the doctor's impression was gained more from the "provisional diagnosis" made in the receiving ward and that he really did not make such an examination of the patient as would enable him to know whether or not she

died from physical injuries. Oedema of the lungs, he explained, was caused by retarded circulation which could have been caused from hemorrhages of the brain, and from his findings it could have been possible the woman had suffered the fracture of her skull.

Appellant's counsel submit that the court erred in forcing a trial on the day of their appointment to defend the accused. The record shows that the woman died on November 4th; the indictment against the defendant was returned on November 25th, and on the 26th he was brought into court, "and comes his attorney." He waived arraignment and entered a plea of not guilty and the case was set for trial December 19th. When the case was called for trial on that day, according to the bill of exceptions, present counsel were appointed and the defendant "forced to immediate trial," to which the defendant excepted.

We may assume that the waiving of arraignment was formal and that the defendant really had no attorney to prepare his case until the day of trial. At least counsel who represented him on the trial were not appointed until that day, and then, according to the certification of the judge, they were *forced* to proceed. It is true there is no affidavit in the record supporting the apparently verbal request for a continuance. Because of their so recent appointment perhaps counsel were not aware of any ground they might have stated in an affidavit. They were not in position to know whether there were or were not witnesses other than those present who knew of the facts of the case. At any rate, the record discloses a judgment of death as the result of a trial forced upon the accused with counsel just appointed who were not given an opportunity to prepare his case. The cause of the woman's death is really a matter of opinion. While the evidence of the extreme brutal treatment she received at the hands of the defendant, according to witnesses introduced for the commonwealth, tends strongly to support the opinion of the coroner that she died as the result of a fractured skull, there was evidence tending to prove that there was no fracture and that her death was due to alcoholic poison. Sufficient time would have enabled the defendant's counsel to investigate this most important matter and perhaps to establish very definitely that the coroner's conclusion was erroneous.

It is the inviolate right of freemen—whether chief and wealthy citizens or destitute black men with unsav-

ory reputations—to have the assistance of counsel when being prosecuted for the commission of a crime. United States Constitution, Sixth Amendment; Constitution of Kentucky, section 11. There may be unusual circumstances where the court need not appoint counsel for the accused, but in cases like this it is the court's duty to do so. Williams v. Commonwealth, 33 Ky. Law Rep. 330, 110 S. W. 339. Having properly given the defendant counsel, the court should not have forced him into a trial before reasonable opportunity was given them to prepare his defence. This is not a technical ground of reversal, but goes to the very foundation of justice—the right of a man to have counsel who have had opportunity to present his defense. This salutary and fair rule is considered fully in McDaniel v. Commonwealth, 181 Ky. 766, 205 S. W. 915; and Miller v. Commonwealth, 197 Ky. 703, 247 S. W. 956. Other subsequent cases are Piercy v. Commonwealth, 195 Ky. 725, 244 S. W. 52; Gillis v. Commonwealth, 202 Ky. 821, 261 S. W. 591; Mitchell v. Commonwealth, 225 Ky. 83, 7 S. W. (2d) 823. There are many cases where the refusal to continue the trial because of the want of time for preparation, either real or claimed, could not be deemed prejudicial error, and others where the record failed affirmatively to show the exercise of diligence on the part of the defendant. But here we have involved the life of a man, and the majority of the court concludes, under all the circumstances, that the judgment should be reversed and the defendant granted a new trial.

Judgment reversed.

Whole court sitting.

Chief Justice Thomas and Judges Dietzman and Rees dissenting.

## Dissenting Opinion by Judge Dietzman.

With the utmost deference to and respect for the opinion of the majority of my Brethren as prepared for them under their direction by Commissioner Stanley, I must dissent, being firmly convinced that it is supported neither by the record nor by the law. The judgment is reversed in this case solely on the ground that the trial court erred in not granting the appellant a continuance in order that counsel whom the court appointed on the day of the trial to defend appellant might have time for preparation. Let us see, now, first whether the record

justifies any such decision or not. The record shows that the woman whom appellant is accused of killing died on November 4, 1929. The indictment against the appellant, whom we shall hereafter call the defendant, was returned on November 25th following. The defendant had evidently been arrested before the indictment was returned and was in custody, for we do not find anywhere in the record where a bench warrant was issued for his arrest. On the contrary, the record recites that on the 26th day of November, 1929, the defendant was brought into court by the jailer and with him "came his attorney," and thereupon the defendant waived arraignment, pleaded not guilty, and his case was assigned to December 19, 1929, for trial. The majority opinion naively states:

"We may assume that the waiving of arraignment was formal and that the defendant really had no attorney to prepare his case until the day of the trial."

Harking back to the days of my practice, a portion of which the earlier years comprised a number of criminal trials, I cannot recall a single case of my own or others where the waiving of the arraignment was not formal. The court calls the case on the docket, stating the charge as "murder," "robbery," or whatever it is, and the accused through his counsel then says: "We waive arraignment and plead not guilty." It is very hard for me to understand how the waiving of the arraignment could be otherwise than formal. And the statement in the opinion that the defendant "really had no attorney to prepare his case until the day of trial" finds no support for its verity save in an assumption made in direct defiance of the recitals in the record. Even so serious a case as this, where the life of the accused is at stake, does not warrant this court in going outside an unattacked record. The order concerning the arraignment states that defendant was present in person and by counsel. The defendant makes no attack upon this order either in his brief or in the record itself. His silence as to it is an admission that on his arraignment he was represented by counsel. The next we hear of this counsel matter is in the motion and grounds for a new trial. The sixth ground reads:

"The court erred in overruling the defendant's motion for a continuance and forced the defendant

into trial without sufficient preparation to prove his case."

I may add that no motion for a continuance can be found in the record, but in the bill of exceptions it is recited:

"Said counsel for defendant was appointed for defendant by the court, the morning of the trial, and was forced to immediate trial over motion for continuance."

Evidently the motion for a continuance was made orally. But we have yet to be told anywhere in the record for what reason the continuance was asked, other than the statement in the motion and grounds for a new trial that the defendant was without sufficient preparation to prove his case. It is not stated that he had not had sufficient time to prepare his case; only that his case had not sufficient preparation. This is no hypertechnical distinction sought for and found by me in the record, but is a sound distinction, and the statement as literally written in the motion and grounds for a new trial was the real reason why the continuance was sought, as I shall establish by the record itself. The defendant's defense was that the deceased died from acute alcoholism and oedema of the lungs. So far as this record shows, defendant could, and even now can, prove that only by the testimony of the physician at the City Hospital where the deceased was taken just prior to her death. This physician was not present in court when the case was called for trial. The impaneling of the jury evidently took up the better part of the day of December 19th, for after the jury had been secured, the record recites that the court recessed until 8 o'clock p. m. On the court reassembling, the record states that on motion of defendant's counsel, a forthwith subpoena was issued for the physician at the City Hospital. He later appeared and testified. So I assert that counsel were not, so far as this record discloses, seeking a continuance in order to prepare themselves to try this case, but because defendant had not subpoenaed his witnesses into court and hence had not, as the motion and grounds for a new trial recites, sufficiently prepared his case. I say he had not subpoenaed his witnesses because, if he had, the order which went would not have been a forthwith subpoena, but an attachment or order of arrest to bring a recalci-

trant witness into court. To me the logic of the record is inescapable. But were it otherwise, and counsel in truth did ask a continuance to permit of their own preparation for trial, the record still fails to show that the trial court abused its discretion in overruling their motion. There is not a line in the record to show what became of the counsel who appeared for the defendant on his arraignment. There is not a line in the record to show that the defendant made any effort to employ other counsel between the time of his arraignment and his trial, or if financially unable to do so, that he made any effort to communicate his plight to the court and to request appointed counsel. There is not a line in the record to show that his failure to request appointed counsel was due to any ignorance of his privileges or rights to have counsel appointed for him. All the record shows is that the defendant was arraigned on November 26th, had his case assigned for trial to December 19th, almost a month later, and then showed up on the day of his trial without counsel. No diligence shown whatever to get ready for his trial. The cases collected in the case of Williams v. Commonwealth, 230 Ky. 327, 19 S. W. (2d) 964, which is a complete refutation of all the majority opinion rests upon, establish without dissent that to entitle an accused to a continuance in order that his counsel may have time to prepare his case, the record must show affirmatively some diligence on the part of the accused in procuring counsel of his own choice or by appointment of the court, or that, through ignorance, the accused was not aware of his right to have counsel appointed for him. Nothing like that appears here. But beyond all this, it is finally settled by the cases cited in the Williams case and by many others, among which are Anderson v. Commonwealth, 235 Ky. 176, 30 S. W. (2d) 898; Haywood v. Commonwealth, 221 Ky. 378, 298 S. W. 985; Hutsell v. Commonwealth, 225 Ky. 492, 9 S. W. (2d) 132, that a case will not be reversed by this court, on the ground here argued, where there is no showing in the record that the attorneys could, if a new trial be granted, make any better showing than they did on the first trial. The motion and grounds for a new trial in this case were filed on December 20, 1929. They were not finally disposed of until January 25, 1930, over a month later. But there is not a line, word, or syllable in the record to indicate that the accused could make any bet-

ter showing by way of testimony or otherwise on a new trial if granted than on the one he had.

Thus, I believe, I have shown that the majority opinion finds no support in the record, in the law, or in logic. This was not a case tried under undue excitement or amidst local prejudice. The murder, if it was murder and the jury decided that it was with ample evidence to sustain its finding, was a most brutal and callous one. The verdict of the jury is indeed a most solemn one, but if it thought the woman was murdered, as it had a right to do from the evidence, it can scarcely be said that the punishment meted out was not in accordance with the brutality of the crime. Courts are, in these days and times, criticized for what are called extreme technicalities upon which they allowed those accused of crime to go scot free. I agree that too much of that criticism is scarcely justified. But some of it is, and, in my judgment, the majority opinion furnishes another example for just criticism. I am authorized to state that Chief Justice THOMAS and Judge REES join with me in this dissent.