## Johnston v. Commonwealth.

Jan. 31, 1939.

JOHN M. WAUGH and HENRY S. McGUIRE for appellant.

HUBERT MEREDITH, Attorney General, and WILLIAM F. NEILL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Reversing.

The appeal is from a conviction of murder and sentence of death.

The appellant, Miller O. Johnston, is a native of Garrard County. When a child the wheels of a wagon ran over his head and inflicted injuries which caused the loss of the sight in one eye. He had married early in life. After he lost his farm, about the year 1924, he became an itinerant evangelist, holding services in tents or tabernacles. In recent years he has been unattached to any religious denomination. He and his family lived in Lexington several years before the tragedy. By a second surgical operation, in 1929 he had been rendered sexually impotent. He was afflicted with a chronic heart disease which caused severe dropsy. His calling kept him away from home much of the time. In the fall of 1936, by reason of his physical condition, including infection from diseased teeth, he came home and was confined to his bed or room for several weeks. For twenty-five years or more, it seems that Johnston and his wife had no marital difficulties. Their children had reached maturity, except a nine-year-old daughter. Previous to this time Johnston's suspicions had been aroused as to the fidelity of his wife. During this period at home those suspicions became stronger, particularly through attentions of a rent collector and another man. We are told by Johnston—and with no contradiction—that a general remark which he made at the supper table was construed by his wife to be a reflection on the rent collector, and she resented it. The result was that the wife had Johnston arrested and placed under bond to keep the peace. This record shows that on the trial Johnston remained mute, or at least protected his wife and children by not disclosing the cause of the difficulty,

and that the prosecution was not actually justified. After he had been committed to the workhouse in default of bond, friends interceded and his wife consented that he be discharged but only on condition that he leave the city and stay away. It is disclosed that she was then afraid of him and regarded him as mentally unsound. In this connection, Dr. C. A. Nevitt reported to the police court the accused's bad nervous and physical condition and expressed the opinion that his confinement "is detrimental to his nervous system." He, therefore, recommended that he be released and allowed to return to his ministerial duties in Indiana as he desired. During the ensuing eleven months Johnston, from time to time, returned to Lexington and went to the neighborhood of his old home, as he stated, to see his little girl who played on the sidewalk and in the yard. His older daughter testified that he had talked with her on the steps of the home several times and possibly had gone inside once or twice. During this time he had tried to effect a reconciliation with his wife.

The defendant closed revival services in Ashland on Sunday evening and returned to Lexington on Monday, October 11, 1937. He talked to his daughter and again asked her to speak with her mother and find out if he could come back and live with his family. According to the defendant's testimony, on Wednesday afternoon he was told by J. R. Pitman that William Rue, whom he described, had been going to his home frequently and his wife had been meeting him at night elsewhere. When he suggested that Rue was calling upon his daughter, Pitman insisted that it was otherwise, and suggested that he watch and see for himself. Pitman testified to Johnston's queer demeanor during a conversation that afternoon but denies having discussed such an affair. About half past six o'clock that evening, according to Frank Utterback, a witness for the Commonwealth, who had gone to the Johnston home to collect a grocery bill, there was a car parked next door. Rue was there. He told Utterback no one was at home. As they were leaving, Mrs. Johnston came up the street and Rue went into the house with her. Utterback, going upon the porch, could see them in the room, which was lighted only by the flame of a gas stove. Mrs. Johnston answered his knock on the door and told him she could not pay the bill. The defendant, Johnston,

was seen coming and the wife said she was afraid of him, and stepped inside. Johnston asked Utterback if his little girl was there. The witness told him he would find out and knocked on the door. Rue answered and said the child was not at home. Johnston then accused Rue of going with his wife. Rue denied it and said he could prove it by her. Johnston stated he wanted to talk with his wife and started to go inside. Rue blocked his way and he told him to stand aside. After the two men had gone through the door the witness heard several shots fired. A boy who had accompanied Utterback, but remained in the automobile on the street, gave the same testimony, except he did not hear the conversations. A daughter of the defendant testified that Rue, to whom she was engaged to marry, had been coming to see her almost every night, and she was expecting him on this occasion.

The defendant tells a connected and clear story of the grounds of his suspicions; of the grief over his wife and loss of home; and of the tragedy itself. He had obtained a pistol from a pawnbroker, who testified that the accused had told him he was buying it for his own protection since he traveled about a good deal at night. However, the defendant contradicted the pawnbroker and testified that he had told him he was getting the pistol to protect his home. This, he explained, was because of fear the men hanging around would kill him. That afternoon he had met up with Pitman, who related that he was having some of the same trouble himself, and, in the course of the conversation, told Johnston about Rue's attention to his wife, as above stated, but in greater detail. It was not long after this conversation that Johnston went near his home and parked his automobile across the street. He says it was in the hope of seeing his baby on the street. He saw the two men and at first thought both of them had gone inside the house. The defendant's story as to what occurred is substantially the same as Utterback related. When he went on the porch he saw a man sitting on a divan with his arm around his wife in the dimly lighted room. The man answered the door and in answer to an inquiry what he was doing there replied that he was waiting for one of the girls, Lelia, to come home. He accused the man of running around with his wife, which he denied. Johnston said, "Let's go in and ask Mrs. John-

ston; she will be the one to prove it by." Rue blocked his way. He drew his pistol and threatened Rue if he did not let him go inside. He had seen his wife jump up from the divan when he knocked on the door. After he entered he called her four or five times before she came and partially opened a door into the room. She started to say something when Rue jumped on him and tried to get hold of the pistol. He got his hand free and shot his wife and then turned and shot Rue. After a little while he voluntarily went to the police station and surrendered. When the police arrived Rue was not quite dead. He was near the front door or in the vestibule. He had a comb in his hand. He died soon afterward. The body of Mrs. Johnston was on the floor in a bedroom.

The trial was for the murder of the wife. The sole defense was insanity. To support this there were introduced several witnesses residing in Lexington; the defendant's sister, brother-in-law, and niece from Rushville, Indiana; and a man and his wife from Ashland, Kentucky, who gave testimony of the manifestations of grief and brooding of the defendant during the interval of eleven months between his being sent away from home and the killing of his wife; of his expressions of continued love for his wife and family; of his desire for a reconciliation and its rejection; of his audible prayers in her behalf and for himself in his trouble; of the great change that had come over his disposition and personality; of distractions in his conversation and sermons; of melancholia and bitterness; and other conditions and circumstances which tended to support the defense. Yet none of these witnesses could qualify to give a layman's opinion as to the mental state of the accused at the time of the homicide. In an effort to support the defense, counsel called Dr. Nevitt as a witness and undertook by interrogation in the nature of a cross-examination to elicit technical evidence concerning the mind of the accused. But the doctor proved to be an antagonistic witness and the effort was futile and, to some extent, disastrous. On questioning by the Commonwealth's Attorney the doctor expressed the opinion that the accused was sane at the time he killed his wife. This was all the professional evidence introduced.

Counsel for the appellant seek a reversal of the judgment upon the sole ground that the court committed

an error in not granting the accused a continuance of his trial and in overruling his motion for a new trial because of the first error.

Johnston was indicted and arraigned on Thursday, the next day following the tragedy. The court then appointed Mr. Strother Kiser, a young attorney, to defend him and set the case for trial on the following Monday, four days later, including Sunday. On the calling of the case then Mr. Kiser filed a motion to set aside the order appointing him upon the ground that the accused had not requested it and was able to employ counsel. There was filed a statement of the defendant that if given time he could employ and pay counsel of his own choice. He also testified on the motion, disclosing that he was practically penniless, but expressing the opinion that if given time he could raise some funds from friends and relatives. His testimony reveals a man who scarcely knew what he could do or ought to do. The case was then re-assigned for the following Monday, October 25th. On the calling of the case then Mr. Henry S. McGuire represented the accused and Mr. Kiser's motion was sustained. In support of his motion for a continuance then made, there was filed an affidavit stating, in substance, that the defendant was a sick man —the particulars being disclosed—and not physically or mentally able to go into the trial; that he had no money; had had no opportunity to employ an attorney when the case was first set for trial; that for some reason Mr. Kiser had not immediately taken up his defense and had declined to defend him; that on the 19th the defendant had employed Mr. McGuire, who had then endeavored to get in touch with witnesses, but because of the limited time and other circumstances had been unable to do so. On the previous Saturday, a friend had employed Mr. John M. Waugh, of Ashland, to assist in his defense, and he was present but had had no opportunity to prepare the case. Johnston had been living in Rushville, Indiana, and had conducted religious meetings at different places. For three weeks he had been in Ashland, Kentucky. It is said that at these places he had mingled with people who had observed his physical and mental condition, and it was avowed that if given time and opportunity the defendant could have a number of witnesses from those places present to give material and helpful evidence supporting his plea and defense. Sub-

pœnæs had been issued for all witnesses the defendant knew about, but there were others who could and would appear if time were allowed to procure their names and residence and their attendance. We are told that Mr. Waugh had come to Lexington the previous Sunday afternoon and had only conferred with his client for a brief while after supper. In opposition, the affidavit of Dr. Nevitt was filed in which he stated that he had examined the defendant on the previous Thursday and that in his opinion he "is now both mentally and physically able to be tried." The court then overruled the motion for a continuance and the trial proceeded, six days after the defendant had been able to obtain the services of an attorney.

At the trial the vital, indeed the only, question was the defendant's state of mind at the moment he killed his wife. Was it such that he was unable to discriminate between right and wrong; or, if he could do so, that he had not will power sufficient to control his actions and was not able to resist an insane impulse to commit the crime? Cf. Thomas v. Commonwealth, 196 Ky. 539, 245 S. W. 164, 167. Or was his state of mind such that he was so inflamed that though he knew the nature of his act, or could resist an insane impulse to commit murder, yet was "the prey to sudden impulse, the fury of the fleeting moment," so as to reduce the grade of his crime to voluntary manslaughter? People v. Zackowitz, 254 N. Y. 192, 172 N. E. 466, 467. Judge Cardozo further aptly wrote in that opinion:

"With only the rough and ready tests supplied by their experience of life, the jurors were to look into the workings of another's mind, and discover its capacities and disabilities, its urges and inhibitions, in moments of intense excitement. Delicate enough and subtle is the inquiry, even in the most favorable conditions, with every warping influence excluded."

The ability or industry of counsel for the defendant is well known, and it is no reflection upon them to say that the record does not evidence a complete preparation of the case. Their client was, at least, in a highly nervous state, due not only to his poor physical health, but the tragic experiences through which he had so recently gone. The testimony of Dr. Nevitt—somewhat in contradiction to his statement before the trial—indi-

cates that. The Commonwealth's evidence was to the effect the wife was not unfaithful, affording the deduction that the defendant's suspicions and accusations were but hallucinations, or the product of an ungeared mind. The court held the motion for a new trial under consideration from October 27, 1937, until March, 1938. In February, upon his order, the defendant was removed from jail to a hospital under guard, where he apparently remained for several months. Judgment and sentence were not pronounced until May 9, 1938. All of which indicates that the contentions of the defendant's counsel were not without merit.

The testimony of the few lay witnesses, though it proved to be insufficient, certainly tended to show a substantial basis for the plea being made in behalf of the defendant. The trial demonstrated, we think, that there were other witnesses available if opportunity had been given to identify and locate them who, from their association with the defendant during the year preceding, were qualified to describe his mental condition throughout the period and possibly establish the continuity of an unbalanced mind. The defendant was not without friends, and we are told professional witnesses could have been produced to give favorable technical evidence. It will not do to shut the door by saying the names of those witnesses should have been given in support of the motion for a continuance. The very difficulty was that neither counsel nor the defendant knew who they were. The attorneys had not had time to investigate the facts upon which the defense must rest or get in touch with all the witnesses. Even had they been made aware of the witnesses, since they were scattered over two states, it is doubtful if their attendance or depositions could have been procured in so brief a time. We think it is a reasonable appraisement of the record to say it shows that.

A request for a continuance of a trial is but a means to an end. The end is a fair trial. The rules by which such motion is to be measured are but secondary means. If their application, though apparently proper at the time, seems to have been unjust, or to have had disastrous result, the error ought to be corrected on the motion for the new trial. What should more profoundly concern the courts on review is whether the right end was achieved—whether there is justice in the verdict.

If it appears there is not, the court should be sensitive to the situation and not permit the accused to be sacrificed on the altar of legal formalism, too literally applied.

Many guilty men may have escaped punishment altogether. Others may have unduly delayed its imposition. But neither of those considerations, nor both of them, can ever warrant the forfeiture of life or liberty of a man, however shocking his crime, without a trial and conviction in conformity with the law. It is an inviolate right of free men to have the assistance of counsel when being prosecuted for the commission of a crime. Constitution of Kentucky, Section 11; Constitution of the United States, Sixth Amendment, U. S. C. A. This constitutional guaranty of the right to counsel imports the right to counsel prepared. To compel a defendant to go into trial without reasonable opportunity to prepare his defense is not technical. It goes to the very foundation of justice. Cass v. Commonwealth, 236 Ky. 462, 33 S. W. (2d) 332, and cases cited therein. Concerning such, the Supreme Court has thus spoken:

"The prompt disposition of criminal cases is to be commended and encouraged. But in reaching that result a defendant, charged with a serious crime, must not be stripped of his right to have sufficient time to advise with counsel and prepare his defense. To do that is not to proceed promptly in the calm spirit of regulated justice but to go forward with the haste of the mob." Powell v. Alabama, 287 U. S. 45, 53 S. Ct. 55, 60, 77 L. Ed. 158, 84 A. L. R. 527.

Six months and fourteen days elapsed between the verdict and the judgment. Eleven days between the tragedy and the trial. A brief delay in the beginning would have enabled a proper preparation of the defense and have worked no harm to the public. It was a grave question whether the administration of justice had pursued a fair course. Doubt that justice had prevailed would have been removed by setting aside the verdict and seasonably assigning the case for re-trial. We are of opinion that the judgment should be reversed and the defendant accorded a new trial.

Judgment reversed.

Whole court sitting.