## Gillis v. Commonwealth.

(Decided April 29, 1924.)

## Appeal from Rockcastle Circuit Court.

1. Criminal Law—Refusal to Grant Continuance Held Error.—Where killing occurred December 13th and defendant was immediately arrested and jailed and bail refused, court erred in not granting him a continuance on December 31st, when defendant showed by affidavit that he was not ready for trial and had had no opportunity to prepare a defense.

2. Bail—Right to Bail Constitutional Right.—The right to bail is a constitutional right, and is often essential to the proper preparation of the defendant's case, and a hearing on application therefor should be granted, if possible.

3. Criminal Law—Witness Cannot Testify as to Belief as to Identity.—If witness recognized a man she could so testify, but if she did not recognize him she could not testify as to her belief as to who it was.

4. Witnesses—In prosecution for Murder Proper to Show on Cross-Examination that Deceased Had Not Voted for Defendant, but Reasons Incompetent.—In prosecution for murder, where defendant testified that he and deceased were friends, it was proper on cross-examination to show that deceased had not voted for defendant, but reasons assigned for not voting for him were incompetent.

5. Homicide—Statements, While Asking for Doctor, Held Not Made Under Sense of Impending Death.—Declarations of deceased as they were taking him home, while he was repeatedly asking that a doctor be sent for and was speaking of being taken to a hospital, were not made under a sense of impending death.

6. Homicide—Declarations Held Made Under Sense of Impending Death.—Declarations made by deceased after he asked that some one to pray for him be sent for, held made under sense of impending death and properly admitted, it appearing that he realized his end was approaching.

7. Homicide—Declarations Admissible Only where First Shown Made when Hope Abandoned.—No witness should be allowed to testify to any declarations of the deceased, unless it is first shown that the declaration was a dying declaration, made when hope of life was abandoned.

8. Criminal Law—Court should have Defined "Affray" in Charging on Manslaughter.—An instruction that killing was voluntary manslaughter, if done in sudden affray, should have defined the word "affray," which is the mutual combat of two or more persons in a public place to the terror of the public.

9. Homicide—Shooting Being Excusable, Immaterial that Bullet Struck Third Person.—If defendant was excusable for shooting, he is not guilty of murder because the bullet struck a man not intended.

10. Criminal Law—Idea should Not be Repeated where it May Confuse the Jury.—An idea should not be expressed twice in an instruction where to repeat it may confuse the jury.

11. Arrest—No Right to Make Arrest if no Offense Committed in Officer's Presence.—A marshal had no right to make an arrest, if no offense was committed in his presence, and persons whom he attempted to arrest for shooting did not shoot until he began shooting.

12. Bail—Marshal Accused of Murder Held Entitled to Bail.—A marshal charged with murder, held, under the facts, entitled to bail.

S. D. LEWIS and C. C. WILLIAMS for appellant.

FRANK E. DAUGHERTY, Attorney General, GARDNER K. BYERS, Assistant Attorney General, and W. N. FLIPPIN, Commonwealth's Attorney, for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON— Reversing.

This appeal is prosecuted by W. F. Gillis from the judgment of the Rockcastle circuit court sentencing him to confinement in the penitentiary for life for the murder of Chester Mullins.

The facts shown by the Commonwealth are these:

The Gauley road in the town of Livingston crosses Round Stone branch over a bridge. John Poynter, after dark on the night of December 13th, 1923, was near the end of this bridge when some one shot back of him; he walked off a little further up the road and some one shot six times. He thought there was some one shooting at him and fell over behind some rocks. No one showing himself he went on up to the house of Chester Mullins, who lived a little further up the road, and when he got there said he was afraid some one would hurt him and asked Chester Mullins to go with him. They then returned to the bridge together. They passed over the bridge and proceeded on down the road four or five hundred feet to the intersection of High street. After they got near High street Will Gillis began to shoot. The second shot hit Chester Mullins and he fell. Poynter then emptied his pistol. He had a flashlight and saw Gillis, also Matt Foure, standing next to the fence with what seemed to be a pistol in his hand. After the shooting Poynter went home and Mullins died in about an hour. The Commonwealth also proved that just after the shooting Judge Foure said to Gillis, "Did you get him?" and Gillis said "Yes," and Judge Foure laughed.

The proof for the defense showed these facts:

Matt Foure was the judge of the police court at Livingston. W. F. Gillis was the town marshal. Judge Foure was blind. He had been to Mt. Vernon that day to get some papers to quiet a disturbance growing out of undue attentions he had been paying the wife of Ray Martin and after dark he asked James Roberts to go with him over to Martin's house as he was blind and could not go alone. Roberts went with him. They passed over the bridge referred to, and after they had passed it there was some shooting down there at the end of the bridge, so Judge Foure when they reached the Martin house sent Roberts back to town to get Gillis, the marshal, to come down and see about the shooting. Roberts went back for Gillis, leaving Judge Foure at the Martin house; neither he nor Foure had any arms and fired no pistols. Gillis asked Roberts to come back with him. They looked around the bridge and couldn't see anybody. They then went on up to the Martin house after Judge Foure. When they got there Foure said for them to go back and look again and if Gillis saw any one that looked suspicious to arrest him, that he would be down in a few minutes. They went back to the bridge and saw two men going through a yard which fronted on High street and the Gauley road. In a little while Ray Martin brought Judge Foure down to the bridge. Gillis and Roberts then each got on one side of him and they walked up the Gauley road to the intersection of High street. Gillis told Roberts to take Judge Foure back to town and he would look around further and come on later. They started up High street and soon saw two men coming down with something in their hands that looked like pistols. When they got down about the intersection a shot was fired, then several shots, one of which struck Roberts in the leg and he fell to the ground. Then a number of shots were fired. Gillis emptied his pistol, which was a thirty-eight, and Poynter emptied his pistol, which was a forty-five. When the first shot was fired Gillis hollered, "Boys, don't do that, consider yourselves under arrest." Gillis testified that when he shot, the man he shot at was shooting at him and he thought he hit the man that was shooting at him, but it was dark and he may have shot at one man and hit the other one. While there is some conflicting evidence the great weight of the testimony is to the effect that the first shot was fired

from the number forty-five pistol and that the shots fired by the smaller pistol followed this. The evidence is undisputed that Poynter had a forty-five pistol and Gillis had a thirty-eight. After the shooting Gillis and Judge Foure took Roberts home; he was shot through the leg and fast bleeding to death. The proof for the defendant is to the effect that Judge Foure did not say to Gillis, "Did you get him?" or Gillis say "Yes," and that there was no laughing by Judge Foure.

The proof as a whole fails to show any motive prompting Gillis to kill either Mullins or Poynter. He and Mullins were friends; there had been no previous difficulty between Mullins and either Judge Foure or Gillis or any bad feeling. Poynter had been living in Covington and had come to Livingston on the preceding Monday. Some trouble had developed between Judge Foure and his wife growing out of his undue attentions to Mrs. Martin. Poynter was Mrs. Foure's son and had remarked more than once that Judge Foure ought to be killed. He had also, after his return on Monday, bought the forty-five pistol from Chester Mullins, and the proof tends to the conclusion that he knew that Judge Foure was at the Martin house that night. There is no proof in the record of any firing of pistols by any one in that neighborhood that night or of any reason for such firing of pistols except as above stated.

Gillis, Foure, Poynter and Roberts were immediately arrested and put in jail at Mt. Vernon, fourteen miles from Livingston. They were indicted on December 17th, or four days later, and the trial was set for December 20th. The indictment was in three paragraphs against Gillis, Foure, John Poynter and James Roberts. In the first paragraph it was charged that they each shot and killed Chester Mullins. In the second that each of them assisted the other three in shooting and killing Mullins. In the third that each conspired with the others to shoot and kill Mullins. When the case was called for trial against Gillis and Foure they announced not ready for trial and asked a continuance; they also moved the court to allow them bail. The court refused to continue the case and set it for trial on December 31st, over the objection of the defendants. He refused to hear the motion for bail on account of numerous other cases already assigned for trial. The defendants then offered to introduce only three witnesses on their behalf on the motion

and allow the Commonwealth as many witnesses as it wished, but this offer was declined. On December 21st the indictment on motion of the Commonwealth attorney was quashed and the prosecution resubmitted to the grand jury. On the same day a second indictment was returned which was substantially the same as the other except a fourth paragraph was added charging a conspiracy with persons unknown to the grand jury to slay Chester Mullins. OnDecember 31st the case was called for trial against Gillis. He filed an affidavit for continuance practically the same as he had filed on December 21st, showing that he was not ready for trial and had not been able to prepare his case for trial by reason of the fact that he had been put in jail immediately after the occurrence, fourteen miles from the scene, and that he had been unable to get the witnesses needed in the case or to learn the full facts he could prove. His affidavit was supported by the affidavit of his attorneys. The court refused a continuance. This ruling presents the first question arising in the case.

In Salisbury v. Commonwealth, 79 Ky. 425, the defendants were indicted on March 30th; two days after the indictment was found they were lodged in jail; the case was set for trial on the day after the indictment was filed in court. They applied for a continuance but a postponement of ten days was allowed for preparation. The case was then tried. On appeal it was held that the court erred in not postponing the case for a greater length of time or grant a continuance.   In Brooks v. Commonwealth, 100 Ky. 194, the killing occurred on the first day of the term. The next day an indictment was returned against him, which was set for trial on the fourth day of the term. The defendant had been confined in jail since the killing. The court overruled his motion for a continuance, but on the appeal it was held that sufficient time had not been given to make the proper preparation for the trial of the case.   In Allen v. Commonwealth, 168 Ky. 325, the killing occurred in August 7th. Allen was then placed in jail. On August 16th the indictment was returned and set for trial on August 19th, a motion for a continuance refused and the judgment was reversed.

The court says:

"It is not the purpose of the law to deprive any person of his life or liberty without giving him reasonable opportunity to establish his innocence, and the dignity and majesty of the law can be better

vindicated by allowing this opportunity than by forcing the accused into a trial so soon after the commission of the offense with which he is charged as that he can not in reason be prepared to answer with the care and preparation demanded by the nature of the charge against him.''

The same rule was applied in McDaniel v. Commonwealth, 181 Ky. 778, and in Miller v. Commonwealth, 197 Ky. 702.

In view of the fact that the defendant had been confined in jail ever since the killing fourteen miles from the scene of the homicide, and that he had had no opportunity to prepare his defense as shown by the affidavit of his attorneys accompanying his affidavit on the motion for a continuance, we are clearly of opinion that the defendant had not had a reasonable opportunity to prepare and present his defense. The court had refused to hear his motion for bail. The right to bail is a constitutional right and the exercise of this right in cases of this sort is often essential to the proper preparation of the defendant's case. Counsel should have a reasonable time and opportunity to get his bearings, to look over the ground and study the case in its various aspects, and in all cases where it is possible a hearing on the question of bail should not be denied.

Susie Mullins testified on the trial that not long before the shooting she saw a man come along stepping light footed, that he got on the porch of the store building at the intersection of High street and the Gauley road and then got behind a tree and was standing there the last she saw of him. She was then allowed to state over the defendant's objection that she thought this was Mr. Gillis. She admitted she did not know who it was, but said that in her judgment it was Gillis. This evidence was material and important for it contradicted the testimony for the defense. If the witness recognized the man she can so testify, but if she did not recognize him she cannot testify as to her belief as to who it was. She can testify to any facts she saw but she cannot testify to any conclusion of her own from these facts. This evidence should have been excluded.

When Gillis was on the stand he testified that he and Mullins were friends. On cross-examination the Commonwealth, over the defendant's objection and ex-

ception, asked him the following question: "Did you in that last race ask Chester Mullins if he was not going to vote for you and he told you that you knew that he could not afford to when you had murdered two of the Mullins?" He made this answer: "No, I did not."

This was highly improper and should not have been allowed. It was competent for the Commonwealth to show that Mullins had not voted for Gillis, but the reasons that Mullins assigned for not voting for him were incompetent. This only served to bring into the case a collateral matter which would not properly be considered here.

A number of witnesses were introduced to prove declarations of the deceased. Some of these declarations were made as they were taking him home, others after he reached his home and had asked that some one be sent to pray for him. The declarations made as they were taking him home were made while he was repeatedly asking that a doctor be sent for and was speaking of being taken to a hospital. These declarations under the facts were not made under a sense of impending death. But the declarations made to the ministers or after he asked that some one to pray for him be sent for, were made under the sense of impending death and were properly admitted. He lived but a short time after this and then realized that his end was approaching. No witness should be allowed to testify to any declarations of the deceased unless it is first shown that the declaration was a dying declaration, made when hope of life was abandoned.

By the first instruction the court told the jury, among other things, that the killing was voluntary manslaughter if done in sudden affray, but he did not define affray, which is a legal term and may not be understood by a jury. On another trial the court will define affray as follows:

"An affray is the mutual combat of two or more persons in a public place to the terror of the public."

In instruction four the court will omit the words "acting with him" after the words "John Poynter" in both paragraphs of that instruction. At the close of the first paragraph of No. 4 these words will be added:

"If defendant was excusable for shooting as above defined, it is not material that the bullet struck a man not intended when the shot was fired."

He will also omit in the second paragraph of that instruction the following words: "and that the defendant, Gillis, thereby brought on such danger to himself or to either of his said co-defendants, if the jury believe from the evidence that any such danger existed, or reasonably appeared to the defendant, Gillis, to exist." This idea is expressed in the foregoing part of the instruction and to repeat it may confuse the jury.

The last paragraph of instruction No. 5 will be omitted and in lieu of that paragraph the following will be inserted:

"But he had no right to make the arrest if they had committed no offense in his presence and he had first begun the difficulty by shooting at them or either of them before either of them did any shooting."

What has been said makes it unnecessary to notice other matters urged in the brief. On the return of the case to the circuit court, the defendant's motion for bail will be heard without unnecessary delay. Under the proof in the record the defendant is entitled to bail.

Judgment reversed and cause remanded for a new trial.