## Page v. Commonwealth.

(Decided June 22, 1934.)

LOUIS I. IGLEHEART for appellant.

BAILEY P. WOOTTON, Attorney General, and DAVID C. WALLS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

Appellant, Forest Page, was convicted of the offense of willful murder and sentenced to life imprisonment. He has appealed.

On Saturday afternoon, August 6, 1932, the appellant, while driving along a street in Owensboro, accidentally sideswiped a car belonging to Herbert Gillian which was parked in front of the home of Miss Lucy May Bell, a friend of Gillian. At this time Gillian was working at a blacksmith shop, and appellant drove to that shop to inform Gillian of the accident, and to tell him that he would pay Gillian for the damage done his car. Appellant arrived at the blacksmith shop in the neighborhood of 4 o'clock. Miss Bell had in the meantime telephoned Gillian and he knew about the accident. There were a number of people in the shop. When appellant entered the shop, Gillian was working at an anvil. Appellant went up to Gillian and said to him that he (Page) had had a little car wreck. Up to this point there is no dispute in the evidence. For the commonwealth, the witnesses who were present say that Gillian replied: "Yes, I heard you had a little sideswipe." Gillian at this point took off his glasses and wiped the perspiration out of his eyes. Stretching forth the glasses to appellant, he continued: "Maybe you need these." Appellant replied: "You are trying to get smart"; and seized a hammer that was on a nearby anvil and started after Gillian. A bystander grappled with appellant and took the hammer away from him, but Page and Gillian clinched and fought around the shop a bit. Gillian got the best of appellant and pommeled him rather severely. In the scuffle, appellant lost his necktie, and, as he claims, his hat and watch, though the commonwealth's witnesses do not seem to be aware that he lost his hat and watch. Appellant crying out that he had enough, Gillian let him up from the floor where the two had fallen and appellant left the shop.

For the appellant, he testifies that he and Gillian had been friends for a long time, and that when he had damaged Gillian's car he promptly went to the blacksmith shop to tell Gillian that he would take care of the damage; that when he went in the shop he said: "Hello, Herb"; but Gillian made no response; that, as he approached closer to Gillian, Gillian took his glasses off and wiped his eyes but remained silent; that he then told Gillian about the wreck and that he would pay for it; and that he was very sorry for the accident; and that Gillian responded: "You God dam s—— of a b——"; and hauled back and hit appellant in the eye and knock-

ed him against the anvil. He describes the rest of the fight not materially differently from the way it is described by the commonwealth's witnesses, although he denies that he seized any hammer or made any hostile demonstration toward Gillian or did anything other than to defend himself from Gillian's attack.

As stated, appellant left the shop. In about half or three-quarters of an hour he returned to the shop. What happened in the meantime is brought out only by appellant's evidence. He states that he went and had his bruises and wounds treated, and then went to the courthouse to get his wife, who, as an election officer, had brought to that place the ballot box used in the primary election held that day, that the two then went to their home, and that when they arrived they discovered Gillian there. Appellant claims that Gillian again cursed him and abused him, but quieted down after a bit, and, on appellant's request that he be allowed to return to the shop and get his hat, necktie, and watch, Gillian said that he could do so, and left. Acting on this permission, appellant later returned to the blacksmith shop.

What happened on his return is thus stated by the commonwealth's witnesses, two or three of whom claim to have been eyewitnesses to the homicide. They state that appellant drove up in his machine, got out, took a shotgun from his car, and, turning, saw Gillian near the front door of the blacksmith shop, and with an oath fired at Gillian, who sank to the ground and soon expired. Appellant then jumped into his machine and disappeared down the street. According to the appellant, when he got to the shop, he started getting out of his car, and as he did so Gillian threw a hammer at him which missed him but struck the car; that as he turned he saw Gillian advancing upon him, and thereupon he grabbed a shotgun which he had put in his car that morning with which to go squirrel hunting and shot Gillian in his necessary self-defense. He admits that he then got in his car, drove off down the street, later changed license plates on his car, and fled the state, traveling through the West and then back East until he was later caught in Ohio and brought back to Kentucky for trial.

As grounds for reversal, it is urged, first, that the court erred in not continuing the case to a subsequent day in the term for trial; secondly, the court erred in

failing to give the whole law of the case in its instruc-
tions; thirdly, the court erred in the instructions which
it did give. Considering these contentions in the order
stated, we find that, when this case was called for trial,
appellant moved for a continuance, and in support of
that motion filed his affidavit, in which he stated that
Pearl Hewett was a very necessary and important wit-
ness in his behalf, and that the just and proper effect
of her testimony could not be had save by her presence
in court; that she had promised to be present at the
trial, but that, on the day before this case was called
for trial, appellant received a letter from her in Ohio to
the effect that her mother was ill and she could not be
present in court to testify on the day the case was set,
but that she could be there a week later; that, relying
on her promise to be present, he had not taken her depo-
sition, but that he would have her in court a week later
if the court would continue the case that long. The
affidavit stated that this witness, if present in court,
would truly testify that she knew appellant and Gillian
very well, and that she knew that Gillian was a high-
tempered, fractious, overbearing, dangerous man, and
that on one occasion he expressed to her his dislike for
appellant and stated that appellant was the only man
that he ever felt like he wanted to kill, that she tried to
get from him the cause of his bitterness, but that he
never revealed to her why he felt so bitter against ap-
pellant. The commonwealth agreeing that this affidavit
might be read as the deposition of the absent witness,
the court overruled the motion for a continuance. On
the trial, the appellant never read this affidavit to the
jury. He now complains that the court committed a
highly prejudicial error in not granting his motion for
a continuance based on the ground stated, because, as
he argues, this was the only witness he had to testify
to the alleged state of feeling of Gillian towards him.
Aside from the fact that it might well be argued that
the facts stated in the affidavit as related above were
not competent, in that there is no time stated when Gil-
lian is alleged to have expressed this hostile feeling to-
wards appellant, and it might have been at so remote a
period as to have been of no competent value on the
trial, still, if appellant wished to take advantage of the
claimed error on the part of the court in forcing him
into trial on condition that the commonwealth permit
him to read this affidavit as the testimony of his absent
witness, appellant should have read the affidavit to the

jury. As said in the case of Lee v. Commonwealth, 203 Ky. 63, 261 S. W. 842, 844, under circumstances like those of the instant case:

> "The record in the case does not disclose that appellant either read or offered to read the statement as Bond's deposition; hence, we cannot conclude, since appellant himself did not think enough of the testimony of this witness to read his deposition, that the court below erred in forcing appellant into trial in the absence of this witness."

The reason for the rule is obvious. If the affidavit be read and the testimony is as important as the accused claims it to be, the jury may give it that importance in weighing the evidence to arrive at a verdict. Therefore the accused should not be allowed to speculate on what the jury may do in the absence of that affidavit and then, when the speculation goes against him, seek a new trial, the necessity of which might have been avoided had the accused read the affidavit in evidence. There is clearly no merit in the first contention of the appellant.

Secondly, it is claimed that in the instruction on voluntary manslaughter the words "in sudden affray" are used without these words being defined anywhere in the instructions, and the case of Gillis v. Commonwealth, 202 Ky. 821, 261 S. W. 591, is relied upon. The Gillis Case appears to have been much misunderstood by the bar, as this court has repeatedly said since it was decided. We have stated many times since that the Gillis opinion did not mean to hold that the failure to define the words "sudden affray" alone would constitute reversible error. In Shepherd's Annotations, under the citation of this Gillis Case, may be found a long list of cases explaining this point of the Gillis Case, and all to the effect that the failure to define the words "sudden affray" is not alone reversible error. Appellant argues, however, that all of these cases are those in which the accused was convicted of voluntary manslaughter, though charged with murder, and that it may be argued that, though not reversible error in such state of case, it is reversible error where the accused is convicted of murder, since, if the jury knew what the words "sudden affray" meant, they might have convicted the defendant of voluntary manslaughter. We need not again examine into the soundness of this argument, since the point has been expressly decided adversely to ap-

pellant's contention in the case of Brummett v. Commonwealth, 235 Ky. 322, 31 S. W. (2d) 391, where the accused was convicted of murder.

Thirdly, it is argued that the court erred in instruction No. 1, instruction No. 2, and instruction No. 5, in that these instructions did not correctly submit to the jury the right of the appellant to kill the deceased in self-defense. The instructions which the court gave are word for word except the names of the accused and the deceased the same as instructions Nos. 1, 2, and 5 in the case of Carnes v. Commonwealth, 146 Ky. 425, 142 S. W. 723, which that case approved. There is no merit in this contention of the appellant.

Finding no error prejudicial to appellant's substantial rights, the judgment is affirmed.