## Pennington v. Commonwealth.
(Decided Jan. 29, 1935.)

512

L. R. WILSON for appellant.

BAILEY P. WOOTTON, Attorney General, and RAY L. MURPHY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Affirming.

The grand jury of Bell county indicted Isaac Pennington and Odell Pennington for the crime of murder committed by the killing of Beatrice Cox, age fifteen. On the ground that he was under the age of seventeen, the prosecution was abated as to Odell Pennington. On a trial before a jury, Isaac Pennington was convicted, his punishment fixed at confinement in the state reformatory for twenty-one years, and a judgment was entered accordingly.

The facts are: Henry Pennington was the father of Isaac and Odell, and with them resided within fifty feet of the home of Oscar Schubert, whose family was composed of himself, wife, Enoch Cox, and Beatrice Cox. Enoch and Beatrice were the son and daughter of Lula Schubert, Oscar's wife, and the stepchildren of Oscar Schubert. The tragedy occurred on Christmas Eve of 1933. Within a few minutes before it occurred, Elam Hoskins entered the home of the Penningtons and was soon followed by Jack Capps and Glenn Carmack. Henry Pennington was engaged in drinking liquor, and within a few minutes after they entered his home, he declared he was going to give Beatrice Cox a drink of whisky "or shoot up the place." He obtained a teacup, poured liquor into it, and immediately left the house in

the direction of the home of Schubert. About the time he got on the outside, Isaac obtained a high-powered rifle and Odell a shotgun and followed after him. It was about dusk or "hardly dark" at the time they did so. Capps, Hoskins, and Carmack followed the Penningtons from the house. The witnesses for the commonwealth are not in agreement as to what occurred after the Penningtons left their home. Henry went to the front door of Schubert's home and knocked on it; at that time Schubert and his family were in the kitchen of their home. Hearing some one knock on the door, Beatrice Cox went to it to see who was there. Within a minute or in a short space of time her mother went to the front door; Beatrice was standing in it and Henry Pennington on the ground in front. He inquired of Mrs. Schubert where Oscar Schubert was, and as he spoke to Mrs. Schubert, "Beatrice leaped out of the door and grabbed him around the waist." Her mother inquired of her what she meant. Henry Pennington repeated his remarks, when she informed him her husband was "around there somewhere." Her husband came into the room where she was, with a gun in his hand and stopped at the door; the gun was drawn at that time. Mrs. Schubert said to him, "Don't shoot, Oscar, you will shoot Beatrice." Mrs. Schubert went into the yard where Beatrice and Henry were and with her arms around his waist, and endeavored to get Beatrice to return to the house. Isaac Pennington came up and took hold of Henry's arm and said, "Come on, Papa, lets go to the house." The latter remarked, "I'm not going to do it," "you go back to the house and mind me," "go right on now," and declared, "me and Slim is going to have this out," and immediately pushed Mrs. Schubert down and away from him, and announced, "Stand back, Beatrice, don't do me that way, me and Slim [Oscar] is going to have this out." At that time, Oscar Schubert, still in his home, said, "well if we're going to have it then, lets have it out," and "hollered" at his wife, "Lula, get out of the way." Glenn Carmack testified that Odell fired the first shot and Beatrice Cox fell when the second shot was fired. Capps testified that Odell shot the shotgun into the window of the Schubert home, and Isaac, with a high-powered rifle, fired the second shot, shooting Beatrice Cox. At the time Isaac fired the shot, he was in front of the Schubert home, standing near Pennington's front

514

yard, fifty-five or sixty feet from Beatrice Cox and Henry Pennington. The shot that killed her was a rifle bullet; "it entered about the right corner of the right eye, ranged slightly upward, and came out the back of her head," from which she immediately died. Henry Pennington shot a pistol, "30 special," into Schubert's home, and Oscar Schubert fired a gun at Henry, Henry was killed, and Oscar was wounded. Neighbors gathered next morning at the home of Oscar Schubert, and Lester Martin found a "30-30 high powered shell" in Schubert's front yard. At the same time, J. M. Evans, the coroner of the county, examined the house and found a hole shot through the door and two windows; the one through one window was a shotgun; through another window, a rifle, and one bullet hole through the door, "a single or pistol bullet." Shotgun shots were found inside of the house. Three shells were picked up in the yard: One a "38 special," one high-powered rifle, and another a shell to a shotgun. Other witnesses examined the house and observed where two shots had passed through the front window into the room; two 38 bullets were found, one of which had gone through the right window sash, hit the ceiling, and fell down. Another entered the window pane, struck the ceiling, and dropped on the floor. A third gunshot had entered a lower room of the house and hit the ceiling; "it looked like a .38 bullet."

The defendant testified that about 4 o'clock in the afternoon Jack Capps and Elam Hoskins came to his father's home, and later Capps, his father, and he went to town. Elam Hoskins went to Schubert's home to remain until they returned. Later Hoskins came to his father's home, and thereafter he (Isaac) kindled a fire in the grate. He claims that when Hoskins came from the home of Schubert, he stated to Henry Pennington, "Our friends want a drink of whisky, said come down, they have some eggs fried for you, they know you haven't anything to eat." His father then poured a drink of whisky in a teacup and walked out of the house with it in his hand; that he (Isaac) stepped out of the house to pick up some kindling, and when he came back into the house he "heard an argument." He stepped out of the house and went down to where his father was. They were arguing. He took hold of his father's arm and asked him to return home and "stop this argument." His father refused to go home with

him. He turned around, walked right behind them, by Mrs. Schubert, and as he turned to face the house, the report and flash of a gun came out of Schubert's door; Beatrice Cox was standing right along by his father with her arms around him, when his father remarked to her, "Don't be that way." The shot came out of the door. He states that a ditch was about thirty-five feet away, and he went into it while they were shooting, where he remained until the trouble was over. He claims that late that evening, while passing the home of Schubert, Beatrice Cox called him to the porch and asked him not to go off, and said to him: "Slim started to shoot Henry [Pennington] as he started to go to town, and she jumped between him and the door to keep him from shooting." Isaac admitted at the time he was in the yard of Schubert, he had a 30-30 rifle, that he carried it with him out of his home, and Odell carried the shotgun. He stated that he was satisfied on that occasion his father shot more than once, in his judgment about six shots. His father did not shoot until the gun was fired from Schubert's house. Beatrice Cox was standing by his father at the time it was shot from the house. He stated that in his judgment one shot killed Henry Pennington and Beatrice Cox. His father was shot in the right breast and came out under the right shoulder blade, "just clearing the shoulder blade." The Penningtons and Schuberts, previous to this occasion, were on friendly terms and no trouble had ever occurred between them. Mrs. Schubert claims that she did not know where the first shot came from or who fired it. Her husband had a rifle in his possession and had carried it around with him in his home before the trouble began. Beatrice Cox was between Henry Pennington and the door, and she turned to go into the house when the first shot was fired. Enoch Cox was in the room with Oscar Schubert, "sort of sideways from him." He said Schubert "fired the first shot." He claimed that Esther Martin was in the door and turned her back and started through the house just as the shot was fired. He did not know how the shot missed Esther. In his judgment, ten or fifteen shots were fired. He had been standing behind Schubert about a minute before Schubert fired the shot, but he did not see Beatrice Cox or Henry Pennington.

It was on this evidence that the verdict of the jury was rendered.

Pennington complains of the admission and rejection of evidence and the admonition of the court relating thereto. On cross-examination of Oscar Schubert, he was asked that, after the shooting was over, if he did not go through the house, on his way meet Esther Jordan, when she said to him, "Lordy Mercy, you killed Beatrice," and if he had not in response thereto used this language, "I could not help it, Honey, I am shot through and through." His response to the question was, "If I did I don't remember it." Esther Jordan testified that Schubert, without using the word "Honey," made this statement to her, or in her presence. Thereupon, the court admonished the jury her statement was only competent to affect the credibility of Schubert as a witness and for no other purpose.

It is Pennington's contention that Schubert's statement to Jordan was a part of the res gestæ and was an admission of his act, resulting in the death of Beatrice Cox, and therefore an exoneration of the accused. It was not a part of the res gestæ, within the commonly accepted meaning of this term. See Stewart v. Com., 235 Ky. 670, 32 S. W. (2d) 29, and cases cited.

It was only competent for the purpose for which it was admitted and the court properly so admonished the jury.

It is argued that Schubert was the instigator of the fight in which Beatrice Cox was killed, and for this reason his statement to Jordan was competent. The evidence satisfactorily shows that Schubert and family were at home, and even though Henry Pennington had received information concerning any statement of and about him of Schubert, the Penningtons were not justified in going armed to his home and shooting therein or at him or at any member of his family.

In view of the evidence, we are not impressed with the suggestion that Schubert was the instigator of the trouble which resulted in the death of Beatrice Cox.

Pennington attempted to prove by witness Shackelford that he had met Schubert that afternoon on the road, going after a gun, and in response to an inquiry of what he was going to do with it, Schubert declared, "I'm going to shoot that G—— d—— s—— of a b——, he can't put it over on me," and on being asked who, Schubert answered, "Henry Pennington." We are un-

able to comprehend the competency of this statement, and in our view the court properly refused to permit it to go to the jury.

The court gave to the jury an instruction on self-defense of the accused and his father, from danger of death, or great bodily harm, real or apparent, at the hands of Beatrice Cox, etc. He complains this instruction was not authorized by the evidence; that "it is elementary that the law applicable to the case depends on the facts and circumstances developed in the evidence and it would be as great an error on the part of the trial court to give an instruction on a subject totally unsupported by evidence as it would be to fail to give an instruction on an issue that was supported by evidence." To sustain this statement, he cites King v. Commonwealth, 187 Ky. 782, 220 S. W. 755; Rowe et al. v. Commonwealth, 206 Ky. 803, 268 S. W. 571; Shelton v. Commonwealth, 145 Ky. 543, 140 S. W. 670; Gillis v. Commonwealth, 202 Ky. 821, 261 S. W. 591.

In those cases the objectionable instruction authorized a conviction of the accused on a theory not established by the evidence. The instructions given herein, and which authorized the jury to convict the accused, are not criticized. It is argued that an instruction should have been given on accidental killing authorizing the jury to acquit the accused on the theory Beatrice Cox was accidentally killed. The evidence does not authorize such an instruction. The evidence discloses no elements of an accidental killing. It is inconceivable that the instruction on self-defense, though not authorized by the evidence in any way influenced the jury to believe from the evidence the accused was guilty of either the crime of murder or manslaughter. Also, he complains because the instruction did not define his right of self-defense as to Oscar Schubert. It is scarcely conceivable that after the accused, his father, and brother, went to Schubert's home, assaulted the inmates with a shotgun, Winchester, and pistol, by shooting into their house, and thereby endangered their lives and made the danger to either of them, if there was any, at the hands of Schubert, the accused was entitled to a self-defense instruction as to Oscar Schubert. If it be conceded that the instruction of self-defense given was erroneous and that the failure to define the accused's right of self-defense as to Schubert was erroneous, sec-

tion 353, Criminal Code of Practice, forbids a reversal for such errors. It reads:

> "The judgment shall be reversed for any errors of law appearing on the record when, upon consideration of the whole case, the court is satisfied that the substantial rights of the defendant have been prejudiced thereby."

This Code provision embraces nonprejudicial errors in the giving and refusing instructions to the jury (Robinson v. Commonwealth, 16 B. Mon. 609; Newsome v. Commonwealth, 204 Ky. 179, 263 S. W. 703), where it conclusively appears the accused is guilty as charged. Scott v. Commonwealth, 198 Ky. 714, 250 S. W. 120.

We are thoroughly convinced the accused has been accorded a fair and impartial trial and the evidence establishes his guilt beyond a reasonable doubt, and no error was committed authorizing a reversal.

Wherefore, the judgment is affirmed.