## Stean v. Commonwealth.

(Decided Feb. 26, 1937)

MOORE & PITTMAN and OLIVER POPPLEWELL for appellant.

B. M. VINCENT, Attorney General, and J. J. LEARY, Assistant Attorney General, for Appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

At the trial of an indictment, found and returned by the Casey county grand jury, accusing him of murdering Archie Wilson, the appellant, Stanley Stean, was convicted of voluntary manslaughter and punished by confinement in the penitentiary for four years. His motion for a new trial was overruled and he prosecutes this appeal. Four grounds are argued by his counsel for reversal which are: (1) Incompetent testimony introduced by the Commonwealth over appellant's objections and exceptions; (2) the evidence was insufficient to support the verdict; (3) prejudicial misconduct of the Commonwealth's attorney during the course of the trial; and (4) newly discovered evidence since the trial; but we have carefully examined and thoughtfully considered each of them and find none of them meritorious. Before discussing them in the order named, a brief statement of the facts leading up to and at the time of the homicide will be made.

It happened in the early part of the night of December 24, 1934, in the road in front of the residence of appellant. The deceased, Archie Wilson, and a brother, Willie Wilson, lived in separate residences on land owned by their father, and in a third residence on the same Wilson premises appellant and his family resided. At the time of the homicide he was living with his second wife, and his family consisted of himself, his wife and the latter's daughter by a former marrage, who was 17 years of age. He also had a daughter by his first marriage who was perhaps some older than his stepdaughter, but she was not at home at the time. For some years prior to the homicide, and while appellant was residing on the same Wilson farm (but perhaps at a different location), the deceased, although married and the father of some children, persisted in associations with those girls and to such an extent as to create comment and to excite suspicion that his motives were immoral. That conclusion was supported by some letters passing between the girls and the deceased which came to the knowledge of appellant. The relationship thus created between the deceased and the two girls produced more or less bad feeling between deceased and appellant, and, according to the testimony, each

of them made many threats against the other. As a result thereof the appellant, after pitching his crop for the year 1933, sold it to his landlord and moved to Louisville, Ky., but deceased continued his annoying conduct after that move. However, after a time he promised to desist, and which was later followed by appellant returning to his former neighborhood.

The promise of deceased to discontinue the course he had theretofore pursued was not altogether kept after appellant's return, but it appears that they had patched up their difficulties and their enmity was not so bitter as it had been prior thereto. They met and spoke to each other, and in the late afternoon of the fatal day there was a meeting of some of the neighbors at the home of Mr. Sam Atwood, who resided in the same community. The party had drinks and the members of it had no doubt been imbibing to some extent before they gathered at Atwood's residence. When that meeting broke up, deceased, his wife, and appellant, with possibly some others, got into the automobile of the deceased and rode to the residence of Willie Wilson, the brother of the deceased who lived in the same neighborhood of both participants in the tragedy. Within a comparatively short time after arriving at Willie Wilson's residence appellant announced that he was going to his own home, when deceased proposed to take him in the latter's automobile, and the two got on the front seat with deceased driving. After a brief period but within which they had time to arrive at appellant's residence, shots were heard by neighbors which appeared to have been fired by different weapons, since some of them were louder than the others. Shortly thereafter the deceased, driving his automobile, appeared at the front gate of his brother Willie Wilson's residence. He got out of the car and went into the house, where he almost immediately slumped on the floor from the effects of two wounds that he had received, one in his left hand and the other at a vital spot in his right side. Some time during the night they carried him to a hospital in Liberty, Ky., the county seat of the county, where he lived until the following Friday, the wounding occurring on Monday.

While lying upon the floor, and in the presence of his wife, deceased called some of his children to him and stated to them that he would have to leave them; that he hated to die, and then proceeded to tell

how he was shot and who did it. As given by the witnesses, it was: "He said Stanley called his wife out and raised the old trouble and he said he told him that was all done settled and they were good friends and said Stanley said, 'No, God Damn you, we're going to settle it right here now.'" He then stated that appellant drew his pistol which he had procured from his residence when he went to the home of Sam Atwood, and began to shoot him; that he attempted to draw his pistol to defend himself but the wife of appellant grabbed his hand and obstructed his use of it until appellant ceased shooting, which was some four or five shots in all, and that as the latter turned to run he, deceased, fired some shots at him but none of which took effect. After making that statement, and before being carried to the hospital, deceased was placed upon a bed and commenced to utter a prayer and asked others to pray for him. Later he repeated, in substance, the declaration that he had told his children in the presence of his wife immediately upon entering the residence of his brother following the shooting. One of the persons to whom he made the statement was his mother, who arrived later in the night. The substance of his account of the shooting as so given was never departed from by him or varied in the least, nor did he ever express any hope of recovery.

Appellant gave a different account of the occurrence. He stated that en route between the residence of Willie Wilson and his residence deceased began to talk about their former difficulties and said to him: "You are harboring one more guilty than one you ain't harboring,"—meaning no doubt appellant's stepdaughter. His testimony then continues thus: "By that time we were down at the house and when we drove up and stopped my wife was standing in the door and I reached up and taken hold of the door and opened it and the door swung back, the door swings back toward the road on that side. When I turned the door loose he hollered for my wife and told her to come there and she came out and she was coming through the gate and I started back toward the rear end beside the running board and I was facing the front end of the car. My wife walked up and laid her left hand on the car and her foot on the fender and she said, 'What do you want?' He said, 'You are harboring one more guilty than one you ain't harboring.' She said, 'What did you tell me a few

days ago in the kitchen?' She said, "Archie, you are drinking, go on home, we don't want no trouble and I repeated, 'No, Archie, we are in no shape to have any trouble;' and he said 'God damn you, I am going to kill you.' My wife screamed and grabbed at his hand and she said, 'Lord, have mercy, for my sake and your sake don't do that.' He shot twice through the windshield at my head and the glass covered me up and blinded me for a second and when it cleared away I made a step forward. * * *" He then stated that deceased got out of his car and he (appellant) moved sideways to its rear and while deceased was continuing to shoot he drew his pistol and began to shoot at deceased, after which he went into his house and deceased departed, driving his car.

He was corroborated in his statement to some extent by his stepdaughter, who testified that she was standing in the front door of the residence and witnessed at least the beginning of the difficulty, if not all of it, but it was proven by a number of witnesses that she had previously stated that she was asleep and saw none of it, and which she did not deny. So that, it may be fairly stated that the only two witnesses testifying to the immediate occurrences were appellant and the deceased in his dying declaration. Of course the appellant, while on the stand, gave in great detail the history of the associations to which we have referred, between the deceased and the two girls, including some threats and near difficulties between the parties; but none of which may be given any defensive effect, except as it may bear on the question as to who was the aggressor at the immediate occasion of the homicide. After giving this much of the substance of the testimony relating to the immediate occason of the homcide we will now take up for consideration the grounds relied on for a reversal.

■ The incompetent evidence complained of in support of ground (1) is the admission of the dying declaration of deceased. It is contended that it did not measure up to the established requirements of the law for its introduction. However, we are cited to no case supporting that contention. It is a fundamental principle of criminal law that a dying declaration—if made in extremis and when the declarant believes he is going to die, and when he neither at that time nor in any other manner expresses any hope of recovery—is ad-

missible, upon the ground that the sense of immediate and certain impending death takes the place of an oath. An unlimited list of domestic cases alone might be cited in support of that statement and its correctness is admitted by learned counsel for appellant. He cites in support of his contention, that the necessary extremis condition of the deceased at the time was not shown, the cases of Vaughan v. Commonwealth, 86 Ky. 431, 6 S. W. 153, 9 Ky. Law Rep. 644 and Gillis v. Commonwealth, 202 Ky. 821, 261 S. W. 591; but neither of them contain anything militating against the admission of the dying declaration in this case, in which, as we have seen, the declarant at the time he made his statement was under a profound conviction that he was fatally wounded and had to go away, and that he hated to die and leave his family. It would be difficult to establish the necessary extremis conditions more completely. We are not called upon to determine what effect, if any, a later expression of hope of recovery might have on a prior declaration made when there existed no such hope, since the deceased in this case never expressed any hope of recovery, nor did he procure any act to be done indicating any expectation on his part that he would survive his wounds. See Robertson's Criminal Law, secs. 457 and 461, and the very late case of Hansel v. Commonwealth, 260 Ky. 148, 84 S. W. (2d) 68. In the cited text and cases there will be found others, in some of which the extremis condition of the declarant was not so conclusively proven as it was in this one. We, therefore, conclude that this ground is without merit.

■ No argument is required to show that ground (2) is likewise unsustainable. As we have seen, practically all the testimony bearing upon the immediate actions of the parties was given in the dying declaration of deceased and the testimony of appellant. Only two or three empty shells at the outside were found in the pistol of the deceased, and which inevitably indicates that he did not fire as many shots as appellant and his stepdaughter attributed to him. In addition, some threats made by appellant of his expectation to kill the deceased were proven and it surely cannot be contended that the verdict based upon the testimony as thus outlined is without support to the extent that it is even flagrantly against the evidence.

■ The alleged misconduct of the Commonwealth's

attorney in support of ground (3) consisted in this: Counsel for defendant, in cross-examining the widow of deceased, exhibited to her a letter (but by whom written is not shown) to which counsel for the Commonwealth objected and remarked at the time. ''That the letter is incompetent at this time for it would not illustrate any issue except to show he killed a fellow by writing a letter.'' The letter was not incorporated in the testimony, nor was it shown to whom the masculine pronoun ''he'' referred, and for which reason alone we are unable to comprehend what bearing the remarks of the Commonwealth's attorney, complained of under this ground, could or did have upon the case. However, we can imagine no material effect that it could have in any state of case, for the language complained of expressed only the grounds of the objection of the Commonwealth's attorney and which grounds might or might not have been sufficient to sustain his objections, dependent upon the relevancy of the letter, which, as we have said, is not shown. In the circumstances no prejudicial effect can be attributed to the statement of the Commonwealth's attorney in making his objections to the introduction of the letter by whomsoever written or upon whatsoever ground the objection was based.

■ The alleged newly discovered evidence in support of ground (4) was the statement that appellant's counsel discovered the pistol of deceased after the trial (but which was discoverable before that) and that it had three empty shells in it, when some witnesses had stated that deceased fired only two shots and that he in his dying declaration had so stated. But it will be remembered that in that dying declaration he said that he fired no shots until after appellant had fatally wounded him, or at any rate that he received no wounds after he commenced shooting at appellant. Whether or not he fired only two shots after he began, or three, can have no material effect upon the issue as to who began the difficulty. Whatever number of shots deceased may have fired all occurred after he was wounded, according to the Commonwealth's proof, and which if true, as the jury no doubt believed, neither of them exonerated appellant from being the aggressor or in any manner excused him for first fatally wounding the deceased who shot according to his dying declaration only in his necessary self-defense. Moreover, it is ex-

tremely doubtful if sufficient diligence to discover the pistol of deceased was made by defendant or his counsel before and during the trial. No one was attempting to conceal it, and the slightest inquiry would have developed its whereabouts and its immediate production. We do not regard this ground as at all meritorious.

This record presents facts exciting sympathy for appellant, growing out of the altogether inexcusable and unwarranted conduct of deceased toward his daughter and stepdaughter. That fact no doubt influenced the jury in attaching the somewhat mild punishment inflicted by its verdict. If the killing occurred in the circumstances detailed by deceased in his dying declaration, it would merit a severer punishment. We, like the jury, cannot help entertaining the sympathy which it no doubt did for appellant; but what is commonly denominated as the "unwritten law" is not recognized in the criminal jurisprudence of this Commonwealth, in the sense that it furnishes a legal excuse for the commission of crime, although juries unconsciously or otherwise give it effect in measuring the punishment therefor. That, no doubt, was done in this case, and we are unable to find any substantial legal ground for interfering with the verdict.

Wherefore, for the reasons stated, the judgment is affirmed.